**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRANSFORMATIONAL STRATEGIES | * | |
| CONSULTING, INC. | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Case No. 07-cv-01606-ESH |
| | * | |
| | * | |
| ACS STATE HEALTHCARE, LLC | * | |
| | * | |
| Defendant | * | |

**PLAINTIFF, TRANSFORMATIONAL
STRATEGIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Transformational Strategies Consulting, Inc. (hereinafter, "TSCI"), Plaintiff, by its attorneys, J. Stephen McAuliffe, III, James A. Sullivan, Jr. and Miles & Stockbridge P.C., pursuant to Fed. R. Civ. P. Rule 56 and LCvR 7(h), files this Motion for Summary Judgment and for grounds in support thereof state that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. TSCI adopts and incorporates herein the attached Statement of Points and Authorities, Statement of Undisputed Material Facts, Exhibits and Proposed Order in support of this Motion for Summary Judgment.

WHEREFORE, TSCI respectfully requests that this Court enter an Order granting this Motion for Summary Judgment and entering a judgment in its favor against Defendant, ACS State Healthcare, LLC in the amount of $2,033,833.00, plus any further relief which this Court deems appropriate.

Respectfully submitted,

/s/ J. Stephen McAuliffe, III

_____

J. STEPHEN McAULIFFE, III – (Bar #432378)
JAMES A. SULLIVAN, JR. – (Bar #475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland  20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail: smcauliffe@milesstockbridge.com
E-mail: jsullivan@milesstockbridge.com

Attorneys for the Plaintiff, Transformational
Strategies Consulting, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. | * * * | |
| Plaintiff | * * | |
| vs. | * * * | Case No. 07-cv-01606-ESH |
| ACS STATE HEALTHCARE, LLC | * * | |
| Defendant | * | |

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF, TRANSFORMATIONAL**
**STRATEGIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Transformational Strategies Consulting, Inc. (hereinafter, "TSCI"), Plaintiff, by its attorneys, J. Stephen McAuliffe, III, James A. Sullivan, Jr. and Miles & Stockbridge P.C., pursuant to Fed. R. Civ. P. Rule 56 and LCvR 7(h), files this Statement of Points and Authorities in Support of their Motion for Summary Judgment and for grounds in support thereof states as follows:

**I.    INTRODUCTION**

This is a simple breach of contract action arising out of an Agreement between TSCI and Defendant, ACS State Healthcare, LLC (hereinafter, "ACS"). In August of 2007, ACS terminated the Agreement "for convenience" thereby obligating ACS to pay TSCI for all invoices issued through August of 2007 and "Early Termination Charges" as provided under the express terms of the Agreement. Despite TSCI's demands, ACS has failed to pay TSCI for amounts due under several outstanding invoices and has further failed to pay TSCI the Early Termination Charges as required by the Agreement. As set forth in more detail below, there are

no material facts in dispute and this Court should determine, as a matter of law, that: (1) ACS terminated the Agreement "for convenience"; (2) ACS breached the terms of the Agreement by failing to pay TSCI for the amounts due on outstanding invoices through August of 2007 and Early Termination Charges; and (3) TSCI is entitled to an award of damages against ACS in the amount of $2,033,833.00.


## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is appropriate `if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Fed. R. Civ. P. 56(c). Material facts are those that affect the outcome of a case. <u>Johnson v. Washington Metropolitan Transit Authority</u>, 355 F. Supp.2d 304, 304 (D.D.C. 2005) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The burden of establishing that there is no genuine issue of material fact lies with the moving party. <u>Id</u>. (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but must set forth specific facts showing that there is no genuine issue for trial. <u>Id</u>. In other words, "[t]he non-moving party's opposition . . . must consist of more than mere unsupported allegations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." <u>Powell v. American Red Cross</u>, 2007 WL 1723656 at *4 (D.D.C., June 13, 2007). "`If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" <u>Id</u>. (quoting <u>Liberty Lobby</u>, 477 U.S. at 249-50 (internal citations omitted)).

As set forth below, this movant has met its burden of establishing that there are no disputes of material fact and that it is entitled to summary judgment as a matter of law.

### III.    STATEMENT OF FACTS

On or about October 13, 2005, ACS engaged TSCI to provide "Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application." (See Statement of Undisputed Material Facts, ¶1).  On September 18, 2006, the parties entered into an Amendment to the Agreement for "Additional Statement of Work to Provide Executive Management Resources and Consulting and Advice Regarding Planning, Start up and formational Executive Management of ACS Solution Center." (See Statement of Undisputed Material Facts, ¶2).[1]

Pursuant to the Agreement, ACS was obligated to pay TSCI "Amended Additional Compensation" as follows:

> This pricing is valid for a minimum quantity of 3 Sr. Executives. This pricing is valid for a minimum two year commitment for each Senior Executive or Senior Specialist.  ACS will designate at contract signing the initial number of Senior Executives and Senior Specialists.
>
> The amended additional Compensation corresponding to the aforementioned amended additional scope as follows:
> ►TSCI Senior Executive:  $ 530,000 per year per person.
> ►TSCI Senior Specialist:   $300,000 per year per person.
>
> The Amended Scope Cost is equal to [# of Senior Executives * $530,000 + # of Senior Specialist * $300,000) * 2 years].

---

[1] All references to the "Agreement" refer to the Agreement between ACS and TSCI as amended by the Amendment to the Agreement dated September 18, 2006.

(See Statement of Undisputed Material Facts, ¶3).    Furthermore, TSCI was to "submit an invoice for an advance payment equal to 10% of the Amended Scope Cost." (See Statement of Undisputed Material Facts, ¶4).

On September 18, 2006, Paul Lehman of ACS sent an e-mail to Fernando Salgado of TSCI designating four (4) senior executives and (2) senior specialist as the initial people needed under the Agreement.  (See Statement of Undisputed Material Facts, ¶5).    On September 20, 2006, TSCI issued its initial invoice of $544,000.00, which was 10% of the total contract price of $5,440,000.00.   (See Statement of Undisputed Facts, ¶6).[2]   ACS paid $544,000.00 to TSCI pursuant to this Invoice.  (See Statement of Undisputed Material Facts, ¶7).

The Agreement provided that work was to commence on September 15, 2006, and was to expire on October 15, 2008.  (See Statement of Undisputed Material Facts, ¶8).    Pursuant to Section 8 of the Agreement, ACS was permitted to terminate the Agreement prior to the expiration of its two-year term under two circumstances.  First, ACS was permitted to terminate the Agreement "for cause" as follows:

> ACS can terminate this Agreement in case of TSCI default due to grave cause or negligence imputable to TSCI, if TSCI fails to remedy to the satisfaction of ACS said default within 30 days of ACS written notification to this effect.  Should this be the case, TSCI shall be paid the Invoices issued up to and including the current month, pro-rated if for a partial month, of final determination to Terminate.

Second, ACS was permitted to terminate the Agreement "for convenience" as follows:

> If, at the ACS's sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:

---

[2] The parties subsequently agreed to exchange two senior specialists, at a rate of $300,000 per year each, for one CTO at the rate of $600,000.00 per year.  Despite this change in personnel, the total contract amount did not change. (See Statement of Undisputed Material Facts, ¶5 n.2).

(a)     ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope or

(b)     TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period.  ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by  TSCI, if Termination within the last six month period of the Contract.

(See Statement of Undisputed Material Facts, ¶9).

Pursuant to the Agreement, ACS began to use the Solutions Center shortly after its creation to manage a health care product development project being created by ACS for the State of New Hampshire and other state governments in general.  (See Statement of Undisputed Material Facts, ¶10).    On April 25, 2007, Tasos Tsolakis was hired by ACS to run the ACS Solution Center.  (See Statement of Undisputed Material Facts, ¶11).  Tom Burlin, ACS EVP and COO stated in an announcement memo dated May 4, 2007 distributed by e-mail to all ACS Employees and TSCI consultants that **"I am very pleased to announce the appointment of Tasos Tsolakis as Senior Vice President in charge of the Solutions Center, reporting to me."** (Emphasis supplied).  (See Statement of Undisputed Material Facts, ¶12).    At that time, TSCI had a team of five (5) senior executive consultants fully engaged in work for the ACS Solutions Center at the direction of Tasos Tsolakis for which TSCI was paid by ACS according

to the Original Agreement as amended on September 16, 2006.  (See Statement of Undisputed Material Facts, ¶13).[3]

On July 6, 2007, Fernando Salgado, the President of TSCI, sent an e-mail to Tom Burlin, the Chief Operating Officer of ACS's parent company, Affiliated Computer Systems, Inc. regarding serious concerns about the State of New Hampshire project performance, schedule and TSCI recommended approach to perform the necessary customization as promised to the State of New Hampshire Government.  (See Statement of Undisputed Material Facts, ¶14).

Tom Burlin replied to Mr. Salgado's July 6, 2007 e-mail and copied Tasos Tsolakis, the ACS executive in charge of the ACS Solution Center on his reply, as follows:

> Fernando, thank you for the update.  I have recently reviewed the status of the project with Tasos and Chris.  While much of the information in your memo reflects the status I received there are some significant points of departure.  I would ask that Dan meet with Chris and Tasos to discuss these differences and the status as reported to me.  I will ask Tasos and Chris to advise me after they meet as to any further actions.   Again thank you for candid assessment.  This is an extremely important program to ACS and myself personally.

(See Statement of Undisputed Material Facts, ¶15).

Mr. Salgado replied to Mr. Burlin's e-mail referenced above, as follows:

> Tom: You are certainly most welcome – I am in daily contact with all 5 TSCI people.
>
> I hope there are no negative backlash from my frank language intended for your eyes, albeit wording is a reflection of our best assessment of an ugly reality.

(See Statement of Undisputed Material Facts, ¶16).

---

[3] Again, the parties subsequently agreed to exchange two senior specialists, at a rate of $300,000 per year each, for one CTO at the rate of $600,000.00 per year.  Despite this change in personnel, the total contract amount did not change.  (See Statement of Undisputed Material Facts, ¶5 n.2).

Subsequently, Tom Burlin assured Mr. Salgado that there would be no negative backlash by stating in his reply e-mail "[n]o, not at all.  Tasos and Chris need to see your assessment as well as myself.  I expect a productive review with Dan."  (See Statement of Undisputed Material Facts, ¶17).

On Friday, July 13, 2007 Tasos Tsolakis sent an e-mail to Dan Acton, the TSCI Senior Executive working for the ACS Solution Center headed by Mr. Tsolakis in which he stated "[e]ffective Monday July 16th, you and your team need to find another sponsor at ACS.  I will not need your services.  Thank you.  Tasos."  (See Statement of Undisputed Material Facts, ¶18).  After July 16, 2007, TSCI continued to do work for the ACS Solution Center notwithstanding Mr. Tsolakis' prior e-mail of July 13, 2007, because on information and belief Tom Burlin and other ACS executives told Mr. Tsolakis to continue to work with TSCI.  (See Statement of Undisputed Material Facts, ¶19).

On Tuesday, August 14, 2007, Tasos Tsolakis telephoned Dan Acton, TSCI Managing Director of this engagement, and told him that: (1) GHS did not perform well financially this past July (2007); and (2) the contract between ACS and TSCI was terminated effective Friday, August 17, 2007.  (See Statement of Undisputed Material Facts, ¶20).

Dan Acton sent an e-mail to Tasos Tsolakis on Wednesday, August 15, 2007 confirming what he had just been told by Mr. Tsolakis regarding the contract termination and specifically advising Mr. Tsolakis that:

> According to our (TSCI) contract amendment with ACS in 2006, on page two, item #8, should ACS terminate for the convenience of ACS, there are two options – (a) TSCI resources can be reassigned to other company projects, or (b) ACS will pay early termination charges in an amount equal to 50% of the remaining balance of the contract.  Furthermore, ACS is obligated to pay TSCI for the invoices issued up to and including the month when the notice of termination is received by TSCI.

(See Statement of Undisputed Material Facts, ¶21).    Also, on August 15, 2007, Dan Acton sent

an e-mail to Nancy Collins, the CFO of the parent company of ACS, Affiliated Computer

Systems, Inc., Government Solutions Group (GSG), which is responsible for the TSCI Contract

budget, as follows:

> Nancy: I got a call from Tasos yesterday about the latest numbers now working for GHS and the need to terminate our (TSCI) contract with ACS.  I'm sorry to hear the company news and know you must be incredibly busy.
>
> Since you have a broad perspective of many of the challenges across the lines of business, I thought you may want to know that our contract provides the feature of assigning the five of us across various lines of business, for example GCS and Federal, where we can immediately help work troubled projects or support integration activities with Albion, where our expertise would help immeasurably.  Also, support to ITSS and the commercial HRO projects could be an immediate place for us to support the larger ACS as a highly valuable alternative.
>
> Although there is a provision (Clause 8(B), page 2) for paying early termination charges of $1.76M, there is also a provision for us to be assigned to other company projects.  Last year's amendment to our contract provides for this reassignment, (Clause 8(a), page 2), and could be of particular value to ACS as an alternative to paying termination charges.
>
> I know there has been keen interest in working the enterprise solution, but there may be farther reaching strategic implications for us to apply our expertise to other program areas.
>
> Please don't hesitate to call if I can be of service.

(See Statement of Undisputed Material Facts, ¶22).

The early termination by ACS of TSCI was subsequently confirmed by Tasos Tsolakis

after ACS's receipt of the two TSCI emails (items 19 and 20 above) regarding ACS' obligation

to pay Early Termination charges, in case ACS would decline the option to assign the TSCI

resources to other projects.  On August 16, 2007, Tasos Tsolakis sent an e-mail to Dan Acton in which he stated:

> As we discussed your team's last day of work is this Friday.  I expect minimum transition given your team's limited involvement. I will schedule a meeting with you, myself and Debra Bangs this Friday to collect badges and finalize exit.

(See Statement of Undisputed Facts, ¶23).

At no time did ACS ever provide TSCI written notice that it was in default of any term of the Agreement.  (See Statement of Undisputed Material Facts, ¶24).  At no time has ACS ever expressed its willingness to continue to work with TSCI under Section 8(a) of the Agreement. (See Statement of Undisputed Material Facts, ¶25).

At the time of the termination of the Agreement, TSCI had invoiced a total of $1,914,766.00 through August of 2007 leaving a remaining balance of $3,525,234.00 of the total Amended Scope Cost of the Agreement.  (See Statement of Undisputed Material Facts, ¶26). Thus, according to Section 8(b), ACS owed TSCI Early Termination Charges of $1,762,617.00 (50% of the remaining balance).  (See Statement of Undisputed Material Facts, ¶27). Furthermore, ACS owed TSCI the following outstanding amounts on invoices issued through August of 2007:  Invoice SC06, $16,166.00 (shortfall); Invoice SC07, $10,202.00 (shortfall); Invoice SC08, $10,202.00 (shortfall); Invoice SC10, $234,646.00.  (See Statement of Undisputed Material Facts, ¶28).

On August 17, 2000 counsel for TSCI sent a letter to ACS enclosing TSCI's invoice for $2,033,833.00 for the full amount due by ACS to TSCI as a result of the early termination under Paragraph 8(b) of the Agreement.  (See Statement of Undisputed Material Facts, ¶29).   ACS has not paid the August 17, 2007 invoice in the amount of $2,033,833.00 due under the terms of the Amendment to the Original Agreement, thereby materially breaching its contract with Plaintiff

TSCI.    (<u>See</u> Statement of Undisputed Material Facts, ¶30).    TSCI has incurred a loss of $2,033,833.00 as a result of the breach by ACS of the Agreement.    (<u>See</u> Statement of Undisputed Material Facts, ¶31).

## IV.    ARGUMENT

### A.    Applicable Principles of Contract Law

The Agreement expressly provides that it "shall be governed in accordance with, the laws of the State of New York."    (<u>See</u> Statement of Undisputed Material Facts, ¶3).    Under New York Law, to prevail on a breach of contract claim, a plaintiff must prove the following:    (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.    <u>Terwilliger v. Terwilliger</u>, 206 F.3d 240, 245-46 (2nd Cir. 2000); <u>First Investors Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d 162, 168 (2nd Cir. 1998); <u>Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.</u>, 2007 WL 1988150 at *9 (S.D.N.Y., July 10, 2007).

"'The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'"    <u>Franklin Apartment Associates, Inc. v. Westbrook Tenants Corp.</u>, ___ N.Y.2d___, 2007 WL 2670092 at *1 (N.Y.A.D. 2 Dept., September 11, 2007)(quoting <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002)).    When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations."    <u>Id</u>.    The construction and interpretation of an unambiguous written contract is an issue of law within the province of the court, as is the inquiry of whether the writing is ambiguous in the first instance.    <u>Id</u>.; <u>Kafka Const., Inc. v. New York City School Const. Authority</u>, 837 N.Y.S.2d 280, 282 (N.Y.A.D. 2 Dept. 2007).    If the language is free from

ambiguity, its meaning may be determined as a matter of law on the basis of the writing alone, without resort to extrinsic evidence. <u>Kafka</u>, 837 N.Y.S.2d at 282. The objective is to determine the parties' intention as derived from the language employed in the contract. <u>Id</u>.

A court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. <u>Terwilliger</u>, 206 F.3d at 245 (citing <u>Cable Science Corp. v. Rochdale Village, Inc.</u>, 920 F.2d 147, 151 (2nd Cir. 1990)). "Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms. . . .[T]he contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." <u>Reda v. Eastman Kodak Co.</u>, 649 N.Y.S.2d 555, 557 (1996) (internal citations omitted).

### B.    It is Undisputed that ACS Terminated the Amendment "For Convenience."

The Agreement provides that ACS was permitted to terminate the Agreement under <u>two</u> circumstances:  (1) "due to grave cause or negligence imputable to TSCI, **if TSCI fails to remedy to the satisfaction of ACS said default within 30 days of ACS written notification to this effect**;" and (2) at ACS's discretion or "for the convenience of ACS."  (<u>See</u> Statement of Undisputed Material Facts, ¶12).  (emphasis added).  There is no dispute that ACS terminated the Agreement in August of 2007.

On Tuesday, August 14, 2007, Mr. Tsolakis called to Dan Acton, TSCI Managing Director, advising him that the contract between ACS and TSCI was terminated effective Friday, August 17, 2007.  (<u>See</u> Statement of Undisputed Material Facts, ¶20).  This oral conversation was subsequently confirmed by e-mail correspondence between Mr. Acton and Mr. Tsolakis, as well as e-mail correspondence between Mr. Acton and Nancy Collins, the CFO of the parent company of ACS, Affiliated Computer Systems, Inc., Government Solutions Group (GSG),

which is responsible for the TSCI Contract budget.  (See Statement of Undisputed Material Facts, ¶¶21-22).

At no time did ACS ever provide TSCI written notice that it was in default of any term of the Agreement, much less provide TSCI with any opportunity to cure any default.  (See Statement of Undisputed Material Facts, ¶24).  Because there is no evidence of any such written notice of a default or an opportunity to cure, ACS's termination of the Amendment, by definition, could not have been "for cause."  Thus, it is undisputed that that ACS terminated the Amendment in August of 2007 "for convenience."

**C.**    **It is Undisputed that ACS breached the Agreement by virtue of its failure to pay TSCI for all invoices issued through August of 2007 and for Early Termination Charges Provided by Section 8(b) of the Agreement; therefore, TSCI is entitled to a judgment against ACS for $2,033,833.00 as a matter of law.**

The Agreement expressly stated that: "[i]f, at the ACS's sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:

(a)    ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope or

(b)    TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period.  ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by  TSCI, if Termination within the last six month period of the Contract.

(See Statement of Undisputed Material Facts, ¶9).

It is undisputed that ACS chose not to opt for Section 8(a) above by modifying "the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope." In fact, Dan Acton brought this option to the attention of Mr. Tsolakis in his e-mail dated August 15, 2007. (See Statement of Undisputed Material Facts, ¶21). Furthermore, in Dan Acton's e-mail to Nancy Collins dated August 15, 2007, Mr. Acton specifically brought this option to her attention as follows:

> Although there is a provision (Clause 8(B), page 2) for paying early termination charges of $1.76M, there is also a provision for us to be assigned to other company projects. Last year's amendment to our contract provides for this reassignment, (Clause 8(a), page 2), and could be of particular value to ACS as an alternative to paying termination charges.
>
> I know there has been keen interest in working the enterprise solution, but there may be farther reaching strategic implications for us to apply our expertise to other program areas.
>
> Please don't hesitate to call if I can be of service.

(See Statement of Undisputed Material Facts, ¶22). Nevertheless, on August 16, 2007, Tasos Tsolakis sent an e-mail to Dan Acton confirming the termination of the relationship of the parties in which he stated:

> As we discussed your team's last day of work is this Friday. I expect minimum transition given your team's limited involvement. I will schedule a meeting with you, myself and Debra Bangs this Friday to collect badges and finalize exit.

(See Statement of Undisputed Material Facts, ¶23).

At no time has ACS ever expressed its willingness to continue to work with TSCI under Section 8(a) (see, Statement of Undisputed Material Facts, ¶25); consequently, the only other

option for ACS was to comply with Section 8(b) requiring it to pay for all Invoices issued up through August of 2007 and to pay Early Termination Charges equal to 50% of the remaining unpaid balance of the Agreement.

On August 17, 2007, TSCI issued its final invoice to TSCI advising it that ACS was obligated to pay all outstanding invoices as well as the Early Termination Charge of 50% of the remaining balance of the total Amended Scope Cost, which totaled $2,033,833.00. (See Statement of Undisputed Material Facts, ¶29). It is undisputed that ACS has failed to pay these amounts to ACS. (See Statement of Undisputed Material Facts, ¶30). Consequently, it is undisputed that ACS has breached the terms of the Agreement as a matter of law and TSCI is entitled to a judgment against ACS for $2,033,833.00.

## V.     **CONCLUSION**

Summary Judgment in favor of Plaintiff, Transformational Strategies Consulting, Inc. is appropriate under the undisputed facts and under the law. It is undisputed that: (1) ACS terminated the Agreement "for convenience"; (2) ACS breached the terms of the Agreement by failing to pay TSCI for the amounts due on outstanding invoices through August of 2007 and Early Termination Charges; and (3) TSCI is entitled to an award of damages against ACS in the amount of $2,033,833.00.

Respectfully submitted,

/s/ J. Stephen McAuliffe, III
_____
J. STEPHEN McAULIFFE, III – (Bar #432378)
JAMES A. SULLIVAN, JR. – (Bar #475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland  20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail: smcauliffe@milesstockbridge.com
E-mail: jsullivan@milesstockbridge.com

Attorneys for the Plaintiff, Transformational
Strategies Consulting, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Case No. 07-cv-01606-ESH |
| | * | |
| | * | |
| ACS STATE HEALTHCARE, LLC | * | |
| | * | |
| Defendant | * | |

_____

**STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF PLAINTIFF, TRANSFORMATIONAL**
**STRATEGIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Transformational Strategies Consulting, Inc. (hereinafter, "TSCI"), Plaintiff, by its attorneys, J. Stephen McAuliffe, III, James A. Sullivan, Jr. and Miles & Stockbridge P.C., pursuant to Fed. R. Civ. P. Rule 56 and LCvR 7(h), files this Statement of Undisputed Facts in Support of its Motion for Summary Judgment and for grounds in support thereof states as follows:

1.    On or about October 13, 2005, ACS engaged TSCI to provide "Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application." (See attached Affidavit of Fernando Salgado, ¶3 & Exhibit 1).

2.    On September 18, 2006, the parties entered into an Amendment to the Agreement for "Additional Statement of Work to Provide Executive Management Resources and Consulting and Advice Regarding Planning, Start up and formational Executive Management of ACS Solution Center." (See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2).[4]

_____

[4] All references to the "Agreement" refer to the Agreement between ACS and TSCI as amended by the Amendment to the Agreement dated September 18, 2006.

3.    Pursuant to the Agreement, ACS was obligated to pay TSCI "Amended Additional Compensation" as follows:

> This pricing is valid for a minimum quantity of 3 Sr. Executives. This pricing is valid for a minimum two year commitment for each Senior Executive or Senior Specialist.  ACS will designate at contract signing the initial number of Senior Executives and Senior Specialists.
>
> The amended additional Compensation corresponding to the aforementioned amended additional scope as follows:
> ► TSCI Senior Executive:  $ 530,000 per year per person.
> ► TSCI Senior Specialist:   $300,000 per year per person.
>
> The Amended Scope Cost is equal to [# of Senior Executives * $530,000 + # of Senior Specialist * $300,000) * 2 years].

(See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2 at p.3).

4.    Furthermore, TSCI was to "submit an invoice for an advance payment equal to 10% of the Amended Scope Cost."  (See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2 at p.4).

5.    On September 18, 2006, Paul Lehman of ACS sent an e-mail to Fernando Salgado of TSCI designating four (4) senior executives and (2) senior specialist as the initial people needed under the Agreement.  (See attached Affidavit of Fernando Salgado, ¶5 & Exhibit 3).[5]

6.    On September 20, 2006, TSCI issued its initial invoice of $544,000.00, which was 10% of the total contract price of $5,440,000.00.  (See attached Affidavit of Fernando Salgado, ¶6 & Exhibit 4).

7.    ACS paid $544,000.00 to TSCI pursuant to this Invoice.  (See attached Affidavit of Fernando Salgado, ¶7 & Exhibit 5)

---

[5] The parties subsequently agreed to exchange two senior specialists, at a rate of $300,000 per year each, for one CTO at the rate of $600,000.00 per year.  Despite this change in personnel, the total contract amount did not change. (See attached Affidavit of Fernando Salgado, ¶5 n.1).

8.     The Agreement provided that work was to commence on September 15, 2006, and was to expire on October 15, 2008.  (See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2 at p.1).

9.     Pursuant to Section 8 of the Agreement, ACS was permitted to terminate the Agreement prior to the expiration of its two-year term under two circumstances.  First, ACS was permitted to terminate the Agreement "for cause" as follows:

> ACS can terminate this Agreement in case of TSCI default due to grave cause or negligence imputable to TSCI, if TSCI fails to remedy to the satisfaction of ACS said default within 30 days of ACS written notification to this effect.  Should this be the case, TSCI shall be paid the Invoices issued up to and including the current month, pro-rated if for a partial month, of final determination to Terminate.

(See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2 at p.2).   Second, ACS was permitted to terminate the Agreement "for convenience" as follows:

> If, at the ACS's sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:
>
> (a)     ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope or
>
> (b)     TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period.  ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by  TSCI, if Termination within the last six month period of the Contract.

(See attached Affidavit of Fernando Salgado, ¶4 & Exhibit 2 at p.2).

10.    Pursuant to the Agreement, ACS began to use the Solutions Center shortly after its creation to manage a health care product development project being created by ACS for the State of New Hampshire and other state governments in general.  (See attached Affidavit of Fernando Salgado, ¶8).

11.    On April 25, 2007, Tasos Tsolakis was hired by ACS to run the ACS Solution Center.  (See attached Affidavit of Fernando Salgado, ¶9).

12.    Tom Burlin, ACS EVP and COO stated in an announcement memo dated May 4, 2007 distributed by e-mail to all ACS Employees and TSCI consultants that **"I am very pleased to announce the appointment of Tasos Tsolakis as Senior Vice President in charge of the Solutions Center, reporting to me."** (See attached Affidavit of Fernando Salgado, ¶10 & Exhibit 6) (emphasis supplied).

13.    At that time, TSCI had a team of five (5) senior executive consultants fully engaged in work for the ACS Solutions Center at the direction of Tasos Tsolakis for which TSCI was paid by ACS according to the Original Agreement as amended on September 16, 2006.  (See attached Affidavit of Fernando Salgado, ¶11).

14.    On July 6, 2007, Fernando Salgado, the President of TSCI, sent an e-mail to Tom Burlin, the Chief Operating Officer of ACS's parent company, Affiliated Computer Systems, Inc. regarding serious concerns about the State of New Hampshire project performance, schedule and TSCI recommended approach to perform the necessary customization as promised to the State of New Hampshire Government.  (See attached Affidavit of Fernando Salgado, ¶12 & Exhibit 7).

15.     Tom Burlin replied to Mr. Salgado's July 6, 2007 e-mail and copied Tasos

Tsolakis, the ACS executive in charge of the ACS Solution Center on his reply, as follows:

> Fernando, thank you for the update. I have recently reviewed the
> status of the project with Tasos and Chris. While much of the
> information in your memo reflects the status I received there are
> some significant points of departure. I would ask that Dan meet
> with Chris and Tasos to discuss these differences and the status as
> reported to me. I will ask Tasos and Chris to advise me after they
> meet as to any further actions. Again thank you for candid
> assessment. This is an extremely important program to ACS and
> myself personally.

(See attached Affidavit of Fernando Salgado, ¶12 & Exhibit 7).

16.     Mr. Salgado replied to Mr. Burlin's e-mail referenced above, as follows:

> Tom: You are certainly most welcome – I am in daily contact with
> all 5 TSCI people.
>
> I hope there are no negative backlash from my frank language
> intended for your eyes, albeit wording is a reflection of our best
> assessment of an ugly reality.

(See attached Affidavit of Fernando Salgado, ¶12 & Exhibit 7).

17.     Subsequently, Tom Burlin assured Mr. Salgado that there would be no negative

backlash by stating in his reply e-mail "[n]o, not at all. Tasos and Chris need to see your

assessment as well as myself. I expect a productive review with Dan." (See attached Affidavit

of Fernando Salgado, ¶12 & Exhibit 7).

18.     On Friday, July 13, 2007 Tasos Tsolakis sent an e-mail to Dan Acton, the TSCI

Senior Executive working for the ACS Solution Center headed by Mr. Tsolakis in which he

stated "[e]ffective Monday July 16th, you and your team need to find another sponsor at ACS. I

will not need your services. Thank you. Tasos." (See attached Affidavit of Fernando Salgado,

¶13 & Exhibit 8).

19.    After July 16, 2007, TSCI continued to do work for the ACS Solution Center notwithstanding Mr. Tsolakis' prior e-mail of July 13, 2007, because on information and belief Tom Burlin and other ACS executives told Mr. Tsolakis to continue to work with TSCI.  (See attached Affidavit of Fernando Salgado, ¶14).

20.    On Tuesday, August 14, 2007, Tasos Tsolakis telephoned Dan Acton, TSCI Managing Director of this engagement, and told him that: (1) GHS did not perform well financially this past July (2007); and (2) the contract between ACS and TSCI was terminated effective Friday, August 17, 2007.  (See attached Affidavit of Fernando Salgado, ¶15).

21.    Dan Acton sent an e-mail to Tasos Tsolakis on Wednesday, August 15, 2007 confirming what he had just been told by Mr. Tsolakis regarding the contract termination and specifically advising Mr. Tsolakis that:

> According to our (TSCI) contract amendment with ACS in 2006, on page two, item #8, should ACS terminate for the convenience of ACS, there are two options – (a) TSCI resources can be reassigned to other company projects, or (b) ACS will pay early termination charges in an amount equal to 50% of the remaining balance of the contract.  Furthermore, ACS is obligated to pay TSCI for the invoices issued up to and including the month when the notice of termination is received by TSCI.

(See attached Affidavit of Fernando Salgado, ¶16 & Exhibit 9).

22.    Also, on August 15, 2007, Dan Acton sent an e-mail to Nancy Collins, the CFO of the parent company of ACS, Affiliated Computer Systems, Inc., Government Solutions Group (GSG), which is responsible for the TSCI Contract budget, as follows:

> Nancy: I got a call from Tasos yesterday about the latest numbers now working for GHS and the need to terminate our (TSCI) contract with ACS.  I'm sorry to hear the company news and know you must be incredibly busy.
>
> Since you have a broad perspective of many of the challenges across the lines of business, I thought you may want to know that

our contract provides the feature of assigning the five of us across various lines of business, for example GCS and Federal, where we can immediately help work troubled projects or support integration activities with Albion, where our expertise would help immeasurably. Also, support to ITSS and the commercial HRO projects could be an immediate place for us to support the larger ACS as a highly valuable alternative.

Although there is a provision (Clause 8(B), page 2) for paying early termination charges of $1.76M, there is also a provision for us to be assigned to other company projects. Last year's amendment to our contract provides for this reassignment, (Clause 8(a), page 2), and could be of particular value to ACS as an alternative to paying termination charges.

I know there has been keen interest in working the enterprise solution, but there may be farther reaching strategic implications for us to apply our expertise to other program areas.

Please don't hesitate to call if I can be of service.

(See attached Affidavit of Fernando Salgado, ¶17 & Exhibit 10).

23.    The early termination by ACS of TSCI was subsequently confirmed by Tasos Tsolakis after ACS's receipt of the two TSCI emails (items 19 and 20 above) regarding ACS' obligation to pay Early Termination charges, in case ACS would decline the option to assign the TSCI resources to other projects. On August 16, 2007, Tasos Tsolakis sent an e-mail to Dan Acton in which he stated:

As we discussed your team's last day of work is this Friday. I expect minimum transition given your team's limited involvement. I will schedule a meeting with you, myself and Debra Bangs this Friday to collect badges and finalize exit.

(See attached Affidavit of Fernando Salgado, ¶18 & Exhibit 11).

24.    At no time did ACS ever provide TSCI written notice that it was in default of any term of the Agreement. (See attached Affidavit of Fernando Salgado, ¶19).

25.     At no time has ACS ever expressed its willingness to continue to work with TSCI under Section 8(a) of the Agreement.  (See attached Affidavit of Fernando Salgado, ¶20).

26.     At the time of the termination of the Agreement, TSCI had invoiced a total of $1,914,766.00 through August of 2007 leaving a remaining balance of $3,525,234.00 of the total Amended Scope Cost of the Agreement.  (See attached Affidavit of Fernando Salgado, ¶21).

27.     Thus, according to Section 8(b), ACS owed TSCI Early Termination Charges of $1,762,617.00 (50% of the remaining balance).  (See attached Affidavit of Fernando Salgado, ¶22).

28.     Furthermore, ACS owed TSCI the following outstanding amounts on invoices issued through August of 2007:  Invoice SC06, $16,166.00 (shortfall); Invoice SC07, $10,202.00 (shortfall); Invoice SC08, $10,202.00 (shortfall); Invoice SC10, $234,646.00.  (See attached Affidavit of Fernando Salgado, ¶¶23-24 & Exhibit 12).

29.     On August 17, 2000 counsel for TSCI sent a letter to ACS enclosing TSCI's invoice for $2,033,833.00 for the full amount due by ACS to TSCI as a result of the early termination under Paragraph 8(b) of the Agreement.  (See attached Affidavit of Fernando Salgado, ¶25 & Exhibit 13).

30.     ACS has not paid the August 17, 2007 invoice in the amount of $2,033,833.00 due under the terms of the Amendment to the Original Agreement, thereby materially breaching its contract with Plaintiff TSCI.  (See attached Affidavit of Fernando Salgado, ¶26).

31.    TSCI has incurred a loss of $2,033,833.00 as a result of the breach by ACS of the Agreement.  (See attached Affidavit of Fernando Salgado, ¶27).

Respectfully submitted,

/s/ J. Stephen McAuliffe, III

_____
J. STEPHEN McAULIFFE, III – (Bar #432378)
JAMES A. SULLIVAN, JR. – (Bar #475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland  20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail: smcauliffe@milesstockbridge.com
E-mail: jsullivan@milesstockbridge.com

Attorneys for the Plaintiff, Transformational
Strategies Consulting, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRANSFORMATIONAL STRATEGIES | * |
| CONSULTING, INC. | * |
| | * |
| Plaintiff | * |
| | * |
| vs. | *    Case No. 07-cv-01606-ESH |
| | * |
| | * |
| ACS STATE HEALTHCARE, LLC | * |
| | * |
| Defendant | * |

**AFFIDAVIT OF FERNANDO SALGADO**
**IN SUPPORT OF IN SUPPORT OF PLAINTIFF, TRANSFORMATIONAL**
**STRATEGIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Fernando Salgado, being first duly sworn, deposes as follows:

1.    I am over eighteen (18) years of age and am competent to testify to the matters stated herein.

2.    I am the President of Transformational Strategies Consulting, Inc.

3.    Attached hereto as **Exhibit 1** is a true and correct copy of the Agreement by and between ACS State Healthcare, LLC and Transformational Strategies Consulting, Inc. to provide Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application, which was executed on or about October 13, 2005.

4.    Attached hereto as **Exhibit 2** is true and correct copy of the Amendment to the Agreement by and between ACS State Healthcare, LLC and Transformational Strategies Consulting, Inc. For Additional Statement of Work to Provide Executive Management Resources and Consulting and Advice Regarding Planning, Start up and formational Executive Management of ACS Solution Center.

5.     Attached hereto as **Exhibit 3** is a true and correct copy of an e-mail from Paul Lehman of ACS that I received on Setpember 18, 2006 designating four (4) senior executives and (2) senior specialist as the initial people needed under the Agreement.[1]

6.     Attached hereto as **Exhibit 4** is a true and correct copy of Invoice SC-001 issued by TSCI's to ACS for $544,000.00, respresenting 10% of the total contract price (the Amended Scope Cost) of $5,440,000.00.

7.     ACS paid $544,000.00 to TSCI pursuant to Invoice SC-001.  Attached hereto as **Exhibit 5** is a true and correct copy of the check stub for check #3000003025 in the amount of $544,000.00 received from ACS.

8.     Pursuant to the Agreement, ACS began to use the Solutions Center shortly after its creation to manage a health care product development project being created by ACS for the State of New Hampshire and other state governments in general.

9.     On April 25, 2007, Tasos Tsolakis was hired by ACS to run the ACS Solution Center.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of an e-mail from Tom Burlin, ACS EVP and COO dated May 4, 2007 to all ACS Employees and TSCI consultants stating that "I am very pleased to announce the appointment of Tasos Tsolakis as Senior Vice President in charge of the Solutions Center, reporting to me**."**

11.     At that time, TSCI had a team of five (5) senior executive consultants fully engaged in work for the ACS Solutions Center at the direction of Tasos Tsolakis for which TSCI was paid by ACS according to the Original Agreement as amended on September 18, 2006.

---

[1] The parties subsequently agreed to exchange two senior specialists, at a rate of $300,000 per year each, for one CTO at the rate of $600,000.00 per year.  Despite this change in personnel, the total contract amount did not change.

12.     Attached hereto as **Exhibit 7** is a true and correct copy of an e-mail dated July 6, 2007, that I sent to Tom Burlin, the Chief Operating Officer of ACS's parent company, Affiliated Computer Systems, Inc., at 8:44 p.m. as well as: Mr. Burlin's e-mail response on July 9, 2007 at 12:11 p.m.; my reply on July 9, 2007 at 12:40 p.m. and Mr. Burlin's reply on July 9, 2007 at 2:40 p.m.

13.     Attached hereto as **Exhibit 8** is a true and correct copy of an e-mail dated July 13, 2007 from Tasos Tsolakis to Dan Acton, the TSCI Senior Executive working for the ACS Solution Center headed by Mr. Tsolakis.

14.     After July 16, 2007, TSCI continued to do work for the ACS Solution Center notwithstanding Mr. Tsolakis' prior e-mail of July 13, 2007, because on information and belief Tom Burlin and other ACS executives told Mr. Tsolakis to continue to work with TSCI.

15.     On Tuesday, August 14, 2007, Tasos Tsolakis telephoned Dan Acton, TSCI Managing Director of this engagement, and told him that: (1) GHS did not perform well financially this past July (2007); and (2) the contract between ACS and TSCI was terminated effective Friday, August 17, 2007.

16.     Attached hereto as **Exhibit 9** is an e-mail dated Wednesday, August 15, 2007 from Dan Acton to Tasos Tsolakis.

17.     Attached hereto as **Exhibit 10** is an e-mail dated August 15, 2007 from Dan Acton to Nancy Collins, the CFO of the parent company of ACS, Affiliated Computer Systems, Inc., Government Solutions Group (GSG), which is responsible for the TSCI Contract budget.

18.     The early termination by ACS of TSCI was subsequently confirmed by Tasos Tsolakis after ACS's receipt of the two TSCI emails (items 19 and 20 above) regarding ACS' obligation to pay Early Termination charges, in case ACS would decline the option to assign the

TSCI resources to other projects. Attached hereto as **Exhibit 11**, is an e-mail dated August 16, 2007, Tasos Tsolakis to Dan Acton.

19.    At no time did ACS ever provide TSCI written notice that it was in default of any term of the Agreement.

20.    At no time has ACS ever expressed its willingness to continue to work with TSCI under Section 8(a) of the Agreement.

21.    At the time of the termination of the Agreement, TSCI had invoiced a total of $1,914,766.00 through August of 2007 leaving a remaining balance of $3,525,234.00 of the total Amended Scope Cost of the Agreement.

22.    According to Section 8(b), ACS owed TSCI Early Termination Charges of $1,762,617.00 (50% of the remaining balance).

23.    At the time of termination of the Agreement, ACS owed TSCI the following outstanding amounts on invoices issued through August of 2007:  Invoice SC06, $16,166.00 (shortfall); Invoice SC07, $10,202.00 (shortfall); Invoice SC08, $10,202.00 (shortfall); Invoice SC10, $234,646.00.

24.    Attached hereto as **Exhibit 12** is a true and correct copy of TSCI Invoice SC10 which accurately represents the amounts due and owing to TSCI as of the time of the termination of the Agreement in August of 2007.

25.    Attached hereto as **Exhibit 13** is a letter dated August 17, 2000 from counsel for TSCI to ACS enclosing TSCI's invoice for $2,033,833.00 for the full amount due by ACS to TSCI as a result of the early termination under Paragraph 8(b) of the Agreement.

26.    ACS has not paid the August 17, 2007 invoice in the amount of $2,033,833.00 due under the terms of the Amendment to the Original Agreement.

27.    TSCI has incurred a loss of $2,033,833.00 as a result of the breach by ACS of the

Agreement.


I HEREBY CERTIFY UNDER THE PENALTY OF PERJURY AND UPON PERSONAL
KNOWLEDGE THAT THE FACTS AND MATTERS CONTAINED IN THE FOREGOING
AFFIDAVIT ARE TRUE.

10/12/07
Date

Fernando Salgado, President
Transformational Strategies Consulting, Inc.

# AGREEMENT BY AND BETWEEN

## ACS STATE HEALTHCARE, LLC
### and
### Transformational Strategies Consulting, Inc.

## TO PROVIDE

### Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application

**EXHIBIT**

*1*

THIS AGREEMENT (hereinafter "Agreement") is made by and between ACS State Healthcare, LLC with offices located at 1800 M Street, NW, Washington, DC 20005 (hereinafter "ACS"), and Transformational Strategies Consulting, Inc. located at 9645 Eagle Ridge Dr, Bethesda, MD 20817 (hereinafter "TSCI"), referred to individually as party and collectively as Parties.

WHEREAS ACS desires to contract with TSCI to secure Executive Consulting and Advice Services regarding the architecture and development of ACS Enterprise Solution for MMIS claims processing; and,

WHEREAS, TSCI desires to perform the provision of these services in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, ACS and TSCI agree as follows:

## 1. ENTIRE AGREEMENT

This Agreement shall constitute the complete and exclusive Statement of understanding between the parties which supersedes all previous agreements, written or oral, and all communications between the parties relating to the subject matter of this Agreement.

## 2. WORK

Pursuant to the provisions of this Agreement, TSCI shall provide Executive Consulting and Advice as described in Exhibit 1 (Scope of Work).

## 3. PERSONNEL

All TSCI personnel performing work under this Agreement shall be subject to the prior approval of ACS. If at any time during the term of this Agreement, any TSCI personnel is found to be negligent in the performance of the work, then TSCI shall, upon receipt of written notice from ACS, replace such personnel with substitute qualified personnel within 30 days.

TSCI shall be solely liable and responsible for providing to, or on behalf of, all persons performing work pursuant to this Agreement, all employee compensation and benefits. ACS shall have no liability or responsibility for the payment of any salaries, wages, unemployment benefits, health, welfare and disability benefits, Federal and local taxes, or other compensation, benefits, or taxes, for any personnel provided by or on behalf of TSCI.

TSCI understands and agrees that all persons performing work under this Agreement are, for any and all purposes, the sole employees or agents of TSCI and not employees of ACS. TSCI shall maintain reasonable business insurance coverage's for itself and any persons under its control in the performance of this contract and shall be solely liable and

responsible for any and all workers' compensation benefits to any person as a result of injuries arising from or connected with any work performed by or on behalf of TSCI pursuant to this Agreement.

Both Parties agree that they will not, without the consent of the other Party, entice, encourage, offer special inducements, or otherwise recruit the employees of opposite Party during the period of the Agreement and for a period of two years thereafter. This clause is not intended to restrict any individual's right of employment but rather is intended to preserve the relationship intended under this Agreement and to prevent the Parties from actively recruiting the employees of the other Party

## 4.  COMPENSATION

The total compensation to TSCI for Services performed under this Agreement  shall not exceed a fixed amount of US $ 1.5 million, except for pre-approved travel which shall re reimbursed on an actual cost basis, which shall be paid by ACS upon receipt of  TSCI Invoices acceptable to ACS as per the following schedule:
> An amount equal to $ 150,000 upon this Agreement signature.
> Eighteen monthly payments, in arrears, equal to $ 75,000 against monthly invoices, the first on November 10, 2005 and the last on April 10, 2006.

For any month, in the event of a termination, the payment shall be pro rated.  In addition, when requested and authorized in advance by the ACS Agreement Monitor, ACS shall reimburse TCSI for reasonable travel expenses in line with the ACS travel policies. Reimbursable costs must have receipts and explanations.

TCSI shall submit an invoice for each payment due in a form acceptable to the ACS. ACS shall pay each invoice, subject to approval by ACS of the Services rendered, within forty-five (45) days after receipt of a complete and accurate invoice.  Submit all invoices as follows:

    ACS State Healthcare, LLC

    Attn: Paul Lehman

    Cost Center _____

    PO Box 981256

    El Paso, TX 79998-1256

    With a copy to M. Lehman at the address identified in Section 24 herein

## 5.  TRAVEL AND OTHER EXPENSES

The "Home Base" for the purpose of this Agreement is Washington DC.  ACS will pay for all reasonable travel, living and other expenses from the Home Base to any US location previously approved by ACS as per ACS Travel Policies applicable to its employees. The Travel and Other Expenses are not included in the Compensation amount mentioned above and they will be paid against monthly Expense Invoices properly

detailed and supported by receipts according to the aforementioned Policy. Travel outside Home Base can not be for periods of time longer than 4 days except for exceptional cases approved by mutual agreement. TSCI commits itself to use extensively means of teleconferencing and collaboration from Home Base to keep expenses to the minimum necessary. TSCI will provide his own office space and facilities at the Home Base.

## 6. FACILITIES

ACS or ACS Affiliates shall provide one executive office, communications and building passes to TSCI when traveling outside the Home Base for periods longer than one day. ACS will also provide any clerical support that might be needed while working in ACS or ACS Affiliate's locations.

## 7. TERM

The term of this Agreement shall commence on October 24, 2005 and shall expire on April 24, 2006, unless earlier terminated in accordance with the Termination provisions of the Agreement..

ACS will have the right, at his sole discretion, to extent the Agreement for an additional period of up to 6 months under the same conditions and compensation rates, upon written notification to TSCI 90 days prior to the scheduled expiration date.

## 8. TERMINATION

ACS can terminate this Agreement in case of TSCI Default due to grave cause or negligence imputable to TSCI, if TSCI fails to remedy to the satisfaction of ACS said default within 15 days of ACS written notification to this effect. Should this be the case, TSCI shall be paid the Invoices issue up to and including the month, pro-rated if for a partial month, of final determination to Terminate.

If, at the ACS'S sole discretion, the Agreement is terminated for the convenience of ACS, then TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI. In addition, ACS will pay TSCI for additional costs of early termination agree hereto by the parties to be equal to fifty percent (50%), if Termination within the first 12 months period, or twenty five percent (25%) if Termination within the last six month period of the Contract, of the remaining balance of the total Contract amount of $ 1.5 million minus the actual payments received by TSCI If TSCI Default is later determined to be based on an event which did not constitute Default, then Termination shall be treated as if for ACS Convenience.

Under any termination, ACS shall provide disposition instructions to TSCI for any materials belonging to the ACS, which is in the custody of the TSCI. TSCI agrees to promptly comply with such disposition instructions.

## 9. AMENDMENTS

No changes to this Agreement or the Exhibits thereto shall be valid and effective unless made in the form of a written amendment which is approved in writing by the authorized officials of ACS and TSCI.

## 10. PROHIBITION AGAINST ASSIGNMENT AND DELEGATION

This Agreement or any interest therein, including, but not limited to, any claim for monies due or to become due with respect thereto, shall not be assigned or delegated, or both, by TSCI, without the prior approval by ACS in writing. Nothing herein shall preclude ACS from assigning the Agreement to one of its Affiliates.

## 11. INDEMNIFICATION

TSCI shall indemnify, defend, and save harmless ACS, their respective agents, officers, and employees from and against any and all claims, suits, actions, including workers' compensation suits, and costs of any kind, including all defense costs, all attorney's fees, arising from its negligent performance or omissions under this Agreement. Further, TSCI shall indemnify, defend, and save harmless ACS, their respective agents, officers, and employees from and against any and all claims, suits, actions, including workers' compensation suits, and costs of any kind, including all defense costs, all attorney's fees, arising as a result of death, personal injury, or damage to real or personal property (including ACS'S property), caused, in whole or in part, by the acts or omissions of TSCI in connection with this Agreement.

## 12. PROPRIETARY RIGHTS

All materials, data and other information of any kind obtained from ACS and all materials, data, reports, programs, and other information of any kind developed by TSCI which incorporate ACS proprietary information or are included in reports, briefings or otherwise developed under this Agreement and paid for by ACS during the performance of this Agreement are confidential and are the property of ACS. TSCI shall take all necessary measures to protect the security and confidentiality of all such materials, data, reports, programs and information. However, the provisions of this paragraph are not applicable to TSCI developed, collected or generated data, reports, programs, and other information of any kind which does not reveal or incorporate ACS specific information and it is based on publicly available information from other sources and of no proprietary applicability. The provisions of this Paragraph shall survive the expiration or other termination of this Agreement.

## 13. DATA SECURITY

TSCI shall protect the security of and keep confidential all materials, data, reports, programs and information received or produced under this Agreement. At the end of this

Agreement, TCSI shall provide ACS an inventory of all reports and other data generated under this Agreement and seek disposition instructions from the Agreement Monitor.

## 14. DISCLOSURE OF INFORMATION

TSCI agrees it shall not disclose any details in connection with this Agreement to any party, except as may be otherwise provided herein or required by law. However, in recognizing TSCI'S need to identify its services and related clients for marketing purposes, ACS shall authorize TSCI publicizing its role under this Agreement upon the following conditions:

- TSCI shall develop all publicity material in a professional manner.

- During the course of performance on this Agreement, TSCI, its employees, agents, and subcontractors shall not publish or disseminate commercial advertisements, press releases, opinions or feature articles using the name or logo of ACS without the prior written consent of ACS. Following the expiration or termination of this Agreement, TSCI may only reference this Agreement in a manner approved by ACS during the Agreement's period of performance.

## 15. PATENT, COPYRIGHT AND TRADE SECRET INDEMNIFICATION

TSCI shall indemnify, hold harmless and defend ACS from and against any and all liability, damages, costs, and expenses, including, but not limited to, defense costs and attorney's fees, for or by reason of any actual or alleged infringement of any United State's patent, copyright, or any actual or alleged trade secret disclosure, arising from or related to the utilization of TSCI'S information provided under this Agreement if and only if ACS has used such information or such information has been provided to ACS in the manner and within the implied limitations when offered or provided by TSCI.

## 16. WARRANTIES

TSCI shall perform this Agreement in a timely manner with the resources previously approved by ACS and exercising world class standards relevant to the specific scope at any given time.

## 17. COMPLIANCE WITH APPLICABLE LAW

TSCI shall comply with all applicable Federal, State and local laws, rules, regulations, ordinances, and directives, and all provisions required thereby to be included in this Agreement are hereby incorporated herein by reference.

TSCI shall indemnify and hold harmless ACS from and against any and all liability, damages, costs, and expenses, including, but not limited to, defense costs and attorney's fees, arising from or related to any violation, proven in the respective Court of Law as

being of the sole and direct responsibility of TSCI, its employees, agents, or subcontractors, of any such law, rules, regulations, ordinances or directives.

## 18. FAIR LABOR STANDARDS

TSCI shall comply with all applicable provisions of the Federal Fair Labor Standards Act, and shall indemnify, defend, and hold harmless ACS, their officers, employees and agents from any and all liability, including, but not limited to, wages, overtime pay, liquidated damages, penalties, court costs, and attorney's fees arising under any wage and hour law, including but not limited to, the Federal Fair Labor Standards Act, for work performed by TSCI'S employees for which ACS may be found jointly or solely liable.

## 19. CAPTIONS AND PARAGRAPH HEADINGS

Captions and paragraph headings used in this Agreement are for convenience only and are not part of this Agreement and shall not be used in construing this Agreement.

## 20. WAIVER

No waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of such provision. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed as a waiver thereof. The specific rights and remedies set forth in this Agreement shall not be exclusive and are in addition to any other rights and remedies provided by law.

## 21. GOVERNING LAW

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

## 22. SEVERABILITY

If any provision of this Agreement or the application thereof to any person or circumstance is held invalid, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby.

## 23. AUTHORIZATION

TSCI represents and warrants that the person executing this Agreement for TSCI is an authorized agent who has actual authority to bind TSCI to each and every term, condition, and obligation of this Agreement and that all requirements of TSCI have been fulfilled to provide such actual authority.

## 24. NOTICES

All notices or demands required or permitted to be given or made under this Agreement shall be in writing and shall be hand delivered with signed receipt or mailed by first-class registered or certified mail, postage prepaid, addressed to the parties at the following addresses. Addresses may be changed by either party giving ten days prior written notice thereof to the other party.

> If to ACS:

   ACS State Healthcare, LLC.
   1800 M Street, NW
   Washington, DC 20005
   Attention:  Mr. Paul Lehman
   214-841-8038 Phone Number
   214-887-0012 Fax Number

> If to TSCI:
   Attention: Fernando Salgado
   9645 Eagle Ridge Dr.
   Bethesda. MD 20817
   301-365-1246

## 25. PENALTIES AND LIQUIDATED DAMAGES

TSCI under this agreement shall provide expert advice based on the best judgment and experience; however TSCI does not make any explicit or implied warranty, assurance or guarantees or make any representations regarding development or implementation estimates or related to the performance, fitness of purpose of any software product provided by any vendor or custom code, integration, test or start up procedures developed or performed by ACS or third parties. TSCI does not assume any liability direct or indirect, neither any type of consequential or liquidated damages that might arise or result from TSCI performance of the Agreement or lack thereof

Notwithstanding the above and with no limitation to the above provision, in the event that any judgment against TSCI would be issue for any and all losses, penalties and liquidated damages, either direct or indirect, explicit or implied including liquidated and consequential  damages and any other losses, that ACS might incur as a result of TSCI performance or lack thereof, TSCI total liability and payment shall not exceed, under any circumstances either individually or in its totally, the total amount of the Agreement's scope portion which is the direct basis for said liability and payment.

## 26. CHANGES AND AMENDMENTS OF TERMS

ACS reserves the right to change any portion of the work required under this Agreement or to amend such other terms and conditions which may become necessary.  Any such revisions shall be accomplished in the following manner:

For any change which does not materially affect the scope of work, period of performance, payments, or any other term or condition included under this Agreement, a Unilateral Change Notice shall be prepared and signed by ACS.

For any revision which materially affects the scope of work, period of performance, payments, or any term and condition included in this Agreement, a negotiated modification to this Agreement shall be executed by the authorized officials of ACS and TSCI.

## 27. SUSPENDED OR DEBARRED ENTITIES

By signing this Agreement, TSCI certifies that it is not presently listed by any federal agency as debarred, suspended, or proposed for debarment from any federal contract activity. If, during the term of this Agreement, this information changes, TSCI shall notify ACS without delay. Such notice shall contain all relevant particulars of any debarment, suspension, or proposed debarment.

IN WITNESS WHEREOF, ACS and TSCI have caused this Agreement to be signed by their duly authorized officers on the day and year first set forth hereinabove.

ACS State Healthcare, LLC

~~Paul Lehman, Senior Vice President~~
Tom Burlin, Group President

10/13/05

Date

Transformational Strategies Consulting, Inc.

Fernando Salgado, President

10/13/05

Date

Page 10 of 11

# Exhibit 1 – Scope of Work

ACS State Healthcare Solutions is currently undertaking an initiative to rewrite their legacy MMIS application from a mainframe, Cobol, CICS, DB2 based application to a state-of-the-art Java based solution utilizing various Websphere components as well as other COTS applications (the "Solution"). During the course of this project, TSCI will serve the role as the Oversight and Audit team. They will engage in all phases of the project plan through final Solution delivery. Unless otherwise directed, TSCI shall consider all portions of the project plan in-scope.

In the role of Oversight and Audit team, TSCI responsibilities are to monitor and audit all aspects of the project including, but not limited to,
* Project Management,
* Technical architecture and design,
* Solution development and integration,
* Solution testing
* Solution deployment,

In order to provide advice, recommendations and counsel to ACS management for the purpose of Management ensuring that the Solution meets the project objectives. This includes ensuring that
* The project remains on schedule,
* The technical designs adhere to industry and product best practices
* The technical designs enable the required business functionality
* The business functionality performs to user requirements in terms of
  ease of use, performance, stability, reliability, and availability.
* The solution is deployable on a repeatable basis

TSCI shall work directly with ACS employees, sub-contractors, and partners to facilitate the resolution of any issues uncovered. TSCI understands the sensitive nature of their role and will take appropriate measures to ensure a positive impact on the project.

During this engagement, TSCI shall report directly to Paul Lehman and ensure that he is aware of all issues that could affect the successful, timely delivery of the Solution. TSCI shall maintain a log of all issues identified and their resolution chronology. TSCI shall escalate to Paul, as appropriate, to ensure a timely resolution of all issues.

TSCI understands their responsibilities to be broad in nature and the evaluation of their performance and successful delivery of their objectives is based upon their ability to provide relevant and timely advice to ACS management to influence the delivery of the Solution in a positive manner and a successful delivery of the Solution.

Page 19 of 19

Within the total Term period of performance of this Agreement this SOW shall not be confined by specific dates but rather a successful delivery of the Solution. ACS and TSCI shall meet minimally on a weekly basis to review their progress and areas of involvement on the project.

TSCI will participate in meetings and work sessions with ACS or other ACS contractors as needed,

TSCI will perform his own research and information gathering that might be necessary to perform analysis and formulate advice and recommendations to the ACS Authority.

ACS will secure for TSCI unrestricted access to ACS sources and vendors and contractors for the purpose of gathering the necessary information, make inquires and receive responses directly in the same conditions as it would be ACS Authority directly performing these tasks. Therefore, TSCI will sign required Non Disclosure Agreements in the same terms as those signed by ACS.

Exhibit 2
Amendment to Agreement By And Between
ACS State Healthcare, LLC and
Transformational Strategies Consulting, Inc.


For Additional Statement of Work To Provide
Executive Management Resources and Consulting and Advice Regarding
Planning, Start up and Formational Executive Management of ACS Solution
Center


As per Article 26, the parties mutually agree to modify the Agreement with the additional
Statement of Work detailed below in this Amendment. This Amendment does not alter or
change the current Agreement Terms and Conditions not modified by this Amendment
nor those related to the existing scope of work for Executive Consulting and Advice
Regarding the Architecture and Development of the ACS Enterprise Claims Processing
Application.

The following amended Terms and Conditions are applicable to this amended additional
statement of work


## 3. Amended Personnel

Resource identification and submittal for ACS approval will be made within two weeks
of the signature of this Amendment. Should a replacement be necessary, TSCI will
exercise maximum practical expedience to secure a satisfactory replacement.

TSCI will exercise maximum practical expedience in securing the resources after this
Agreement Amendment is signed, but not later than 3 weeks after receipt of down
payment.

ACS will have the right, but not the obligation, to offer employment contracts to any of
the TSCI assigned resources after the contractual period of two years, with no additional
compensation to TSCI.


## 7. TERM

The term of this additional statement of work will commence on September 15, 2006 and
shall expire on October 15, 2008.


ACS and TSCI Agreement to Include Exhibit 2 into HC Agreement           Page 1 of 4   

**EXHIBIT**

**2**

## 8. TERMINATION

ACS can terminate this Agreement in case of TSCI default due to grave cause or negligence imputable to TSCI, if TSCI fails to remedy to the satisfaction of ACS said ~ *ACS termin...* default within 30 days of ACS written notification to this effect. Should ~~this be the case~~, TSCI shall be paid the Invoices issued up to and including the current month, pro-rated if for a partial month, of final determination to Terminate.

If, at the ACS'S sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:

a) ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope or

b) TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI. In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period. ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by TSCI, if Termination within the last six month period of the Contract.

## Amended Additional Scope

The TSCI additional total scope under this Amendment includes Executive management and leadership of the Solution Center resources and activities necessary for planning, start up implementation, operations and formal transition to ACS management. Specific tasks will include:

1. Strategic direction and leadership regarding methods, tools and activities to execute the Solution Center scope.
2. Actual executive daily management of all SC resources.
3. Coaching of the ACS Management Team assigned to the Solution Center in order to enable a seamless transition after the SC formation period of 2 years.
4. Evaluation and decision making regarding vendors within the ACS Corporate standards.
5. Strategy, planning and execution of an offshore strategy for solution development and maintenance. This might include centers operated by ACS or outsourced to vendors.
6. Vendor management.
7. Periodic and ad hoc reports to ACS Executive Management as might be required.

Assumptions:
1. Solution Center Executive will report to the ACS Government Group President, "ACS Executive".
2. SC Executive will have ultimate authority regarding human resources in the SC (within the ACS Corporate HR policies and guidelines).
3. SC Executive will submit recommendations regarding service vendors to the ACS Executive for final decision. These recommendations will include vendor selection, contracting T&Cs (subject to ACS Legal Counsel Approval), change of vendors and cancellation of contracts if necessary.
4. SC Executive will have the decision regarding software and hardware vendors (subject to ACS Government Group CIO's approval)
5. In order to have an optimum transition, ACS Management Team - in -Training (still reporting to TSCI Sr. Executives) no later than 18 months after start of the SC ( a minimum of 6 months to prepare seamless transition)..
6. TSCI will have 2 dedicated offices in the ACS DC building with priority access to a conference room for SC business. TSCI will also have three executive offices in Atlanta.
7. All TSCI resources will have a full time equivalent dedication.


## Amended Additional Compensation

This pricing is valid for a minimum quantity of 3 Sr. Executives.
This pricing is valid for a minimum two year commitment for each Senior Executive or Senior Specialist. ACS will designate at contract signing the initial number of Senior Executives and Senior Specialists.

The amended additional Compensation corresponding to the aforementioned amended additional scope as follows:
  ➢ TSCI Senior Executive: $ 530,000 per year per person.
  ➢ TSCI Senior Specialist: $ 300,000 per year per person.

The Amended Scope Cost is equal to [(# of Senior Executives * $530,000 + # of Senior Specialist * $300,000) * 2 years].

The Contractual year has 240 work days. The monthly billing will be based on actually worked full time equivalent work days during the month. The billing work day rate will be $ 2208 for each Sr. Executive and $ 1250 for each Sr. Specialist. ACS shall not request any reduction in the number of work days from a minimum of 20 days per month. TSCI will provide, in each monthly billing, the accumulated number of work days in the year, such as not to exceed the total work days allocated for each category per Contract year.


ACS and TSCI Agreement to Include Exhibit 2 into HC Agreement          Page 3 of 4   FAS

TSCI will submit an invoice for an advance payment equal to 10% of the Amended Scope Cost within one day of this Amendment signature. Should the number of TSCI personnel actually engaged differ from the initial number designated at contract signing, then the advanced payment will be recomputed and the difference will be reimbursed to ACS.

The daily compensation in the monthly billing will be reduced by 10% which is a net of $1988 per day for each Sr. Executive and $1125 per day for each Sr. Specialist.

Activities related to this statement of work (Exhibit 2) performed by Fernando Salgado will be included in the existing compensation of Exhibit 1.

## Amended Travel and Other Expenses

The home base for travel expenses purposes will be approved by ACS with the confirmation of each specific resource.

IN WITNESS WHEREOF, ACS and TSCI have caused this Agreement Amendment to be signed by their duly authorized officers.

ACS State Healthcare, LLC

Tom Burlin, Group President

9/18/06

Date

Transformational Strategies Consulting, Inc.

Fernando Salgado, President

3/18/06

Date

**Fernando Salgado**

| | |
|---|---|
| **From:** | Lehman, Paul [Paul.Lehman@acs-inc.com] |
| **Sent:** | Monday, September 18, 2006 8:27 PM |
| **To:** | 'f.salgado@tsci.biz' |
| **Subject:** | Initial number of people |

Initial people: sr executives - 4; sr specialists - 2

1

**EXHIBIT**

3

## *Transformational Strategies Consulting, Inc.*



**Check payable to:** Transformational Strategies Consulting, Inc.
**Mail to:**  Treasurer
9645 Eagle Ridge Dr.
Bethesda, MD  20817-3920
Telephone: (301) 365-1246
Email: treasurer@tsci.biz

**IRS #:** 02-0724100;    **DUNS:** 148685196         **Invoice Number:** TSCI-SC 001
Date:  20 – September - 2006

| Contract Ref.: | Exhibit 2 of ACS State Healthcare Agreement |
|---|---|
| **Attention:** | |
| | Mr. Paul Lehman |
| | ACS State Healthcare , LLC |
| | Cost Center _____ |
| | P.O. Box 981256 |
| | El Paso, TX 79998-1256 |
| | |

| DESCRIPTION OF SERVICES AND/OR REIMBURSABLE EXPENSES | AMOUNT |
|---|---|
| Down payment according to Exhibit 2 of ACS State Healthcare Agreement and ACS 9/18/06 Instruction for 4 Sr. Executives and 4 Sr. Specialists. | $544,000.00 |
| **Amount Due** | **$544,000.00** |

Fernando Salgado, President
TSCI Authorized Signature, September 20, 2006

Invoice Approved for Payment by: _____

Date: _____

**EXHIBIT**

4

| | VENDOR NO TRA03876 | | | CHECK NUMBER 3000000025 | | DATE 10/25/2006 |
|---|---|---|---|---|---|---|
| ACS State & Local Solutions, Inc. | | | | | | |
| Glenpointe Centre East Teaneck, New Jersey 07666 | | | | | | |
| PURCH ORDER | INVOICE | INVOICE DATE | VOUCHER NO. | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
| | TSCISC001.092006 | 09/20/2006 | 1086554 | 544,000.00 | 0.00 | 544,000.00 |
| | | | TOTAL | 544,000.00 | 0.00 | 544,000.00 |

**EXHIBIT**

5

**From:** Burlin, Tom
**Sent:** Friday, May 04, 2007 7:14 AM
**Subject:** Announcement Memo
**Importance:** High

To:          ACS Employees
From:        Tom Burlin, ACS EVP and COO
Date:        May 4, 2007

EXHIBIT

6

Re:        Tasos Tsolakis to Head ACS Solutions Center

I am very pleased to announce the appointment of Tasos Tsolakis as Senior Vice President in charge of the Solutions Center, reporting to me.

Tasos is a proven, dynamic, results-driven senior executive in the high-tech field and he is ideally suited to lead the Solutions Center. In his prior roles with Fortune 100 companies, he consistently exceeded annual revenue and profit growth targets and was known as a leader who would excite and motivate large teams. He has successfully expanded and managed large-scale global business functions, which should fit well with our ACS global expansion objectives. Tasos brings to ACS the experience in leading large scale enterprise development and implementations. He has the skills and experience in transforming product and software development by implementing global best practices, standardization, and consistency in methodology.

Tasos joins ACS from The Home Depot, in Atlanta, GA., where he was a Corporate Officer and Vice President of Direct to Consumer Solutions and IT Shared Services and was responsible for the development, management and support of all solutions for the $1 billion Direct to Consumer Business unit. Prior to Home Depot, Tasos spent 8 years with General Electric's Information Services business located in Gaithersburg, Maryland as Senior Vice President Global Professional Services and Product Development. In this role, he transformed the product set from proprietary based systems to open systems. He created a standard platform with common components for user authentication, billing, transaction management and application monitoring as well as implemented Six Sigma methodologies for solutions development. Prior to joining GE, Tasos spent 16 years with AT&T where he held numerous technical and management positions in the areas of Network Services, Data Services and Professional Services.

Named to the Top 100 ComputerWorld IT Leaders list in 2003, Six Sigma Certified, and a member of the RosettaNet Service Provider Board of Directors, Tasos holds an MBA in Finance and Entrepreneurship from the University of Pennsylvania, Wharton Business School, and a Ph.D. and M.S. in Electrical Engineering from Virginia Polytechnic Institute and State University - Blacksburg, VA.

Please join me in welcoming Tasos to the senior executive leadership team and to our business.

## Fernando Salgado

**From:**      Burlin, Tom [Tom.Burlin@acs-inc.com]
**Sent:**      Monday, July 09, 2007 2:40 PM
**To:**        'Fernando Salgado'
**Subject:**   RE: Urgent - MMIS CritSit Worsening


No, not at all. Tasos and Chris need to see your assessment as well as myself. I expect a productive review with Dan.

-----Original Message-----
From: Fernando Salgado [mailto:f.salgado@tsci.biz]
Sent: Monday, July 09, 2007 12:40 PM
To: Tom Burlin
Subject: Re: Urgent - MMIS CritSit Worsening

Tom: You are certainly most welcome - I am in daily contact with all 5 TSCI people.

I hope there are no negative backlash from my frank language intended for your eyes, albeit wording is a reflection of our best assessment of an ugly reality.

Regards at home.

Your friend.
-----Original Message-----
From: "Burlin, Tom" <Tom.Burlin@acs-inc.com>
Date: "Mon, 9 Jul 2007 12:11:45
To:"'Fernando Salgado'" <F.Salgado@tsci.biz> Cc:"Deelsnyder, Christopher"
<Christopher.Deelsnyder@acs-inc.com>,
"Tsolakis, Tasos" <Tasos.Tsolakis@acs-inc.com>
Subject: RE: Urgent - MMIS CritSit Worsening

Fernando, thank you for the update. I have recently reviewed the status of the project with Tasos and Chris. While much of the information in your memo reflects the status I received there are some significant points of departure. I would ask that Dan meet with Chris and Tasos to discuss these differences and the status as reported to me. I will ask Tasos and Chris to advise me after they meet as to any further actions. Again thank you for candid assessment. This is an extremely important program to ACS and myself personally.


-----Original Message-----
From: Fernando Salgado [mailto:F.Salgado@tsci.biz]
Sent: Friday, July 06, 2007 8:44 PM
To: tom.burlin@acs-inc.com
Subject: Urgent - MMIS CritSit Worsening


Tom: I deeply regret the need to send you this email.  While no one wants to be the messenger of bad news, TSCI works for you and owes YOU an unbiased and confidential "Blue assessment" of the situation.

1

**EXHIBIT**

**7**

Dan Acton is scheduling a meeting with you as soon as your schedule permits.
He will provide many more details and recommendations and some root causes.


Our observations are the result of TSCI five top, world class, experts in the Program:
complex Systems and Program Management (Acton); IBM technology development, integration and
testing (Kumar Bhaskaran); complex security and environments (M. Baenziger); Requirements
Extractions / Documentation (C.
McClenaghan) and Contractor Management (Fleming).


In essence, WIPRO has been unable to deliver anything of use; furthermore, longer delays have
become increasingly evident to the point where June 30,
2008 NH dates are extraordinarily difficult to achieve.  WIPRO early performance test
(EPT) code was finally delivered (still unworkable), after huge delays and reflects the total
inability of WIPRO to perform ANY task on schedule and with predictable quality.  The (new)
Iteration 1 desperately needed to start the NH customization (ES2) is now 7 weeks behind
schedule (after WIPRO promises in February), and in reality it will protract in keeping with
WIPRO tradition and the gap between on-shore and off-shore management.  All other Iterations
are also late, by 2-3 months with final regression test occurring in June 2008, when NH UAT
is promised, and no chance of any reasonable NH customization period.   In contrast with
these long known WIPRO deficiencies, WIPRO continues to receive ACS unprecedented leniency
and commercial advantages, with nothing in return to ACS's favor.


ACS recently lost two key and superlative SME Leaders, for Claims Adjudication and
Members/Case Management, to EDS.  This is extremely troubling due to the huge hole in
expertise left on the functional development team, and despite a period of "white gloves" and
HR centric approach. Now, the rumor mill is rampant with reorganization and personnel cuts.
There has been no focus on the CritSit.


We also understand NH Client confirmed his long standing unwillingness to accept a phased
release and increased dissatisfaction with ACS DSD requirements extraction and documentation
process.


The latest excuse is to blame most issues on the complex (IBM) technology instead of an inept
WIPRO and legacy OMINICAID management, the truth is that multiple products suite (even
including several product vendors) are the routine in large complex programs, which can still
be successfully delivered by suitable management.


Our recommended approach to develop NH ES2 deliverables presented to you in February and
further discussed with Chris Deelsnyder is even more critical now.  There were essential
immediate tasks for execution in the April/May period, which are still pending a final
decision on the ES2 approach.  This decision has been withheld on the 'hope' that WIPRO (with
18 months history of false promises despite past permissive ACS management) would demonstrate
tremendous and radical improvement after these recent large commercial concessions, such that

WIPRO could also perform the ES2 scope.    This is a highly unrealistic expectation and the resulting indecision is causing the worsening of an already difficult CritSit.

Tom, I just could not wait any longer after almost 3 months waiting for a decisive CritSit management style with results.    Instead, we have been concerned by some crafted unrealistic optimistic messages that might be reaching you.

Can NH still be recovered? Perhaps, let's talk either directly or with Dan.

Fernando Salgado

TSCI President and CEO

Cel. 301-801-9048

**From:** Tsolakis, Tasos [mailto:Tasos.Tsolakis@acs-inc.com]
**Sent:** Friday, July 13, 2007 4:05 PM
**To:** Acton, Dan
**Subject:** TSCI Work

Dan,

Effective Monday July, 16th, you and your team need to find another sponsor at ACS.

I will not need your services.

Thank you

Tasos

EXHIBIT

8

**Fernando Salgado**

| | |
|---|---|
| **From:** | Acton, Dan [Dan.Acton@acs-inc.com] |
| **Sent:** | Wednesday, August 15, 2007 12:02 AM |
| **To:** | Tsolakis, Tasos |
| **Cc:** | Deelsnyder, Christopher |
| **Subject:** | Follow-up to your call this afternoon |

Tasos,

I was surprised with your telephone call to me this afternoon since we (TSCI) are fully engaged in extremely critical tasks on the ACS MMIS Enterprise Project for which you have requested our focus, with the concurrence of Chris Deelsynder and Tom Burlin.

To follow-up from your call to me at my ACS DC office this afternoon, I wanted to take this opportunity to ensure I understood your directions.

You explained to me that GHS did not perform well financially this past July (2007). As such, you need to terminate our contract. Furthermore, you said that after a conversation you had with Chris Deelsynder and Tom Burlin, that our (TSCI) termination with ACS would be effective this Friday, August 17, 2007.

I asked if anyone else at ACS or on the enterprise team was aware of this action and if we should involve anyone else in our departure. You said that only Chris and Tom were aware of this decision and that there was no need to get others involved at this point. I also asked if there was any other basis for this decision and you said no.

According to our (TSCI) contract amendment with ACS in 2006, on page two, item #8, should ACS terminate for the convenience of ACS, there are two options - (a) TSCI resources can be reassigned to other company projects, or (b) ACS will pay early termination charges in an amount equal to 50% of the remaining balance of the contract. Furthermore, ACS is obligated to pay TSCI for the invoices issued up to and including the month when the notice of termination is received by TSCI.

Fernando was traveling today, but I have a status meeting with him tomorrow.

I presume you would like any on-going work turned over to our respective counterparts by Friday. Please let me know if I can provide any additional assistance.

Regards,
Dan

Daniel A. Acton
Managing Director
TSCI InfoTech Management LLC
(972) 567-2428 cell

8/15/2007

**EXHIBIT**

*9*

**From:** Acton, Dan [mailto:Dan.Acton@acs-inc.com]
**Sent:** Wednesday, August 15, 2007 5:03 PM
**To:** Collins, Nancy
**Subject:** TSCI Contract Options

Nancy:

I got a call from Tasos yesterday about the latest numbers not working for GHS and the need to terminate our (TSCI) contract with ACS. I'm sorry to hear the company news and know you must be incredibly busy.

Since you have a broad perspective of many of the challenges across the lines of business, I thought you may want to know that our contract provides the feature of assigning the five of us across various lines of business, for example GCS and Federal, where we can immediately help work troubled projects or support integration activities with Albion, where our expertise would help immeasurably. Also, support to ITSS and the commercial HRO projects could be an immediate place for us to support the larger ACS as a highly valuable alternative.

Although there is a provision (Clause 8(b), page 2) for paying early termination charges of $1.76M, there is also a provision for us to be assigned to other company projects. Last year's amendment to our contract provides for this reassignment, (Clause 8(a), page 2), and could be of particular value to ACS as an alternative to paying termination charges.

I know there has been keen interest in working the enterprise solution, but there may be farther reaching strategic implications for us to apply our expertise to other program areas.

Please don't hesitate to call if I can be of service.

**EXHIBIT**

_10_

Regards,
Dan


Daniel A. Acton
Managing Director
TSCI InfoTech Management LLC
(972) 567-2428 cell

-----Original Message-----
From: Tsolakis, Tasos
Sent: Thursday, August 16, 2007 7:41 AM
To: Acton, Dan
Cc: Deelsnyder, Christopher
Subject: Re: Follow-up to your call this afternoon

Dan,

The decision is based  of the many discussions we had on this subject.
The basic issue is the mismatch of skills of the TSCI team with the
needs of the ACS business.  It is not appropriate for ACS to pay for
skills that do not meet our needs.

Regards,

Tasos

--------------------------
Sent from my BlackBerry Wireless Handheld



-----Original Message-----
From: Tsolakis, Tasos
Sent: Thursday, August 16, 2007 7:47 AM
To: Acton, Dan
Cc: Deelsnyder, Christopher; Collins, Nancy
Subject: Re: TSCI ETC and Course of Action

Dan,

As we discussed your team's last day of work is this Friday. I expect
minimum transition given your team's limited involvement. I will
schedule a meeting with you, myself and Debra Bangs this Friday to
collect badges and finalize exit.

Tasos
--------------------------
Sent from my BlackBerry Wireless Handheld

**EXHIBIT**

11

# *Transformational Strategies Consulting, Inc.*

# INVOICE

**Check payable to**: Transformational Strategies Consulting, Inc.
**Mail to**:  Treasurer
       9645 Eagle Ridge Dr.
       Bethesda, MD  20817-3920
       Telephone: (301) 365-1246
       Email: treasurer@tsci.biz

**ACS Vendor #** 00246257
**IRS #**: 02-0724100; **DUNS:** 148685196    **Invoice #:  TSCI-SC10 of August 17/07**

| **Contract Ref.:    ACS Solution Center Planning, Start up and Management** |
| --- |
| **Attention:** |

|  |  |
| --- | --- |
| Mr. Tasos Tsolakis | cc. Mr. Tom Burlin |
| ACS State Healthcare , LLC | cc. Mr. Paul Lehman |
| Cost Center _____ | cc. Mr. C. Deelsnyder |
| P.O. Box 981256 | |
| El Paso, TX 79998-1256 | |

| DESCRIPTION OF SERVICES AND/OR REIMBURSABLE EXPENSES | AMOUNT |
| --- | --- |
| ACS Solution Center Planning, Start up and Management as per Exhibit 2, Amendment to Agreement with TSCI.  Final Invoice due to ACS Early Termination of Contract and ACS having de-facto selected Clause 8, Option (b) in page 2 of Amendment, Exhibit 2; plus shortfalls of previous Invoices.<br>TSCI –SC06 Shortfall<br>TSCI –SC07 Shortfall<br>TSCI –SC08 Shortfall<br>Early Termination Full Month of August (23 work days for 4 Sr. Execs + 1 CTO), as per Clause 8, ACS Option (b)<br>Early Termination Charge, as per Clause 8, ACS Option (b)<br><br>**NOTE:** Invoice TSCI-SC09 for $ 207,754.00 for period 7/1-31/07, already submitted, must be fully paid as per the Contract.  This amount for TSCI-SC09 is not included in this Invoice TSCI-SC10. | <br><br><br><br>$  16,166.00<br>$  10,202.00<br>$  10,202.00<br>$ 234,646.00<br>$ 1,762,617.00 |
| **Total Amount Due Upon Receipt** | **$ 2,033,833.00** |

_____
Fernando Salgado, President and CEO
TSCI Authorized Signature, August 17, 2007

**EXHIBIT**

**12**

**ACS Approval Signature for Payment**

# MILES & STOCKBRIDGE P.C.

**J. Stephen McAuliffe, III**
**(301) 517-4829**
**smcauliffe@milesstockbridge.com**

August 17, 2007

**·VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND VIA FIRST CLASS MAIL**

ACS State Health Care, LLC
1800 M Street, NW,
Washington, DC 20005

Attn: Mr. Paul Lehman

Re:    Agreement by and between ACS State Health Care, LLC and
         Transformational Strategies Consulting, Inc. Dated October 13, 2005
         As Amended September 18, 2006

Dear Mr. Lehman:

This firm is counsel for Transformational Strategies Consulting, Inc.  I have reviewed the original agreement by and between ACS State Health Care, LLC ("ACS") and Transformational Strategies Consulting, Inc. ("TSCI") dated October 13, 2005 (the "Contract") and the Amendment to the Contract, copies of which are attached hereto marked Exhibit 1, collectively. I have also reviewed the e-mails sent by Tasos Tsolakis on behalf of ACS to Daniel Acton, TSCI's Managing Director on Thursday, August 16, 2007 confirming ACS's termination for convenience of the Contract as Amended.  Copies of the August 16, 2007 e-mails are attached hereto marked Exhibit 2, collectively.

As you know, Paragraph 8(b) of the Contract as amended provides as follows:

> b)    TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent

---

**EXHIBIT**

**13**

MILES & STOCKBRIDGE P.C.

ACS State Health Care, LLC
August 17, 2007
Page 2

(50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period. ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by TSCI, if Termination within the last six month period of the contract.

Accordingly, TSCI is owed $1,762,617.00 as a result of ACS's early termination of the Contract under Paragraph 8(b) of the Contract as amended. This amount does not include an invoice for the full month of August (per the Contract) and other outstanding invoices, as identified in the attached invoice. As a result of ACS's early termination under Paragraph 8(b), TSCI is owed the total sum of $2,033,833.00. A copy of TSCI's invoice for this amount is attached hereto marked Exhibit 3. Please provide payment of the full sum due and owing to TSCI pursuant to the invoice attached within ten (10) days.

Mr. Tsolakis stated in his e-mail of August 16, 2007 to Dan Acton that "I will schedule a meeting with you, myself and Debra Bangs this Friday to collect badges and finalize exit." If you require any further information from TSCI or need to contact TSCI for any reason, please let me know.

Sincerely,

J. Stephen McAuliffe, III

JSM:kj
enclosures

cc:     Tom Burlin, Chief Operating Officer
        Tasos Tsolakis
                *via e-mail and via certified mail,*
                *return receipt requested*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. | * * * | |
| Plaintiff | * * | |
| vs. | * * | Case No. 07-cv-01606-ESH |
| ACS STATE HEALTHCARE, LLC | * * | |
| Defendant | * | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Upon consideration of the Motion for Summary Judgment filed by Plaintiff, Transformational Strategies Consulting, Inc. and any opposition thereto, it is on this _____ day of _____, 2007, by the United States District Court for the District of Columbia,

ORDERED, that the Motion for Summary Judgment filed by Plaintiff, Transformational Strategies Consulting, Inc., be and the same is hereby GRANTED; and it is further

ORDERED, that judgment be and the same is hereby ENTERED in favor of Plaintiff, Transformational Strategies Consulting, Inc. and against Defendant, ACS Healthcare, LLC in the amount of in the amount of $2,033,833.00.

_____
JUDGE ELLEN S. HUVELLE
United States District Judge
U.S. District Court for the District of Columbia

cc:    J. Stephen McAuliffe, III
James A. Sullivan, Jr.
MILES & STOCKBRIDGE P.C.
11 N. Washington Street
Suite 700
Rockville, Maryland 20850


Lynn M. Deavers, Esquire
David E. Mills, Esquire
DOW LOHNES, PLLC
1200 New Hampshire Avenue, N.W., Suite 800
Washington, D.C. 20036-6802