IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. | * * * |
| Plaintiff | * * |
| vs. | * Case No. 07-cv-01606-ESH * * |
| ACS STATE HEALTHCARE, LLC | * * |
| Defendant | * |

**PLAINTIFF, TRANSFORMATIONAL STRATEGIES, INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT, ACS HEALTHCARE, LLC'S
MOTION FOR PARTIAL DISMISSAL OF COMPLAINT**

Transformational Strategies Consulting, Inc. (hereinafter, "TSCI"), Plaintiff, by its attorneys, J. Stephen McAuliffe, III, James A. Sullivan, Jr. and Miles & Stockbridge P.C., pursuant to LCvR 7(b), files this Memorandum in Opposition to Defendant, ACS Healthcare, LLC's Motion for Partial Dismissal of Complaint and for grounds in support thereof states as follows:

**I.    INTRODUCTION**

TSCI filed this breach of contract action against ACS State Healthcare, LLC (hereinafter, "ACS") arising out of an Agreement between the parties, which ACS terminated in August of 2007 "for convenience." The Agreement expressly obligated ACS to pay TSCI for all invoices issued through August of 2007 and "Early Termination Charges" (hereinafter, "ETC"). Despite

TSCI's demands, ACS failed to pay TSCI for amounts due under several outstanding invoices and failed to pay TSCI the ETC as required by the Agreement.[1]

In response to the Complaint, ACS has filed the present Motion for Partial Dismissal of Complaint, in which it argues that TSCI's claim for ETC should be dismissed. ACS maintains that the calculation of the ETC under the plain language of the Agreement yields a negative number, and that TSCI has, therefore, failed to state a claim upon which relief can be granted. As set forth in more detail below, ACS's interpretation of the relevant language in the Agreement is wrong and is inconsistent with the undisputed intent of the parties to provide a positive measure of compensation in the event that ACS chose to terminate the agreement prior to the expiration of the two year period for "convenience." Thus, ACS's interpretation of the Agreement is not only wrong but would render it without force or effect and would contravene the principal purpose of the ETC.

## II.   FACTS

On or about October 13, 2005, ACS engaged TSCI to provide "Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application." On September 18, 2006, the parties entered into an Amendment to the Agreement for "Additional Statement of Work to Provide Executive Management Resources and Consulting and Advice Regarding Planning, Start up and formational Executive Management of ACS Solution Center."[2]

---

[1] TSCI filed a Motion for Summary Judgment on or about October 12, 2007 [Dkt.#7], which is pending, asking this Court to determine, as a matter of law, that: (1) ACS terminated the Agreement "for convenience"; (2) ACS breached the terms of the Agreement by failing to pay TSCI for the amounts due on outstanding invoices through August of 2007 and Early Termination Charges; and (3) TSCI is entitled to an award of damages against ACS in the amount of $2,033,833.00. TSCI adopts and incorporates herein its arguments set forth in its Motion for Summary Judgment filed.

[2] All references to the "Agreement" refer to the Agreement between ACS and TSCI as amended by the Amendment to the Agreement dated September 18, 2006.

The Agreement expressly stated that: "[i]f, at the ACS's sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:

> (a)  ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope or

> (b)  TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI. In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period. ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by TSCI, if Termination within the last six month period of the Contract.

In August of 2007, TSCI received notice from ACS that it was terminating the Agreement.[3] Subsequent to the termination of the Agreement, TSCI clearly apprised ACS of its calculations and demand for ETC.[4] At all times subsequent to ACS's termination of the Agreement for convenience, TSCI consistently calculated the ETC and provided ACS with its demands for payment. At no time prior to the institution of this lawsuit did ACS ever dispute TSCI's calculation of the ETC or suggest in any way that its calculations were in error. Furthermore, until the filing of its Motion for Partial Dismissal, ACS never claimed that the ETC was a negative number.

---

[3] For purposes of this Motion, ACS does not dispute the fact that this was a termination "for convenience."
[4] For purposes of this Motion, ACS does not disputed that ACS chose not to opt for Section 8(a) above by modifying "the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope."

II.  **ARGUMENT**

A court should accord the language of a contract its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. <u>Terwilliger</u>, 206 F.3d at 245 (citing <u>Cable Science Corp. v. Rochdale Village, Inc.</u>, 920 F.2d 147, 151 (2nd Cir. 1990)). "Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms. . . .[T]he contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." <u>Reda v. Eastman Kodak Co.</u>, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) (internal citations omitted).[5]

When interpreting a contract, the Court's aim is to determine "a practical interpretation of the expressions of the parties to the end that there be a `realization of [their] reasonable expectations.'" <u>Brown Bros. Elec. Constrs. v. Beam Constr. Corp.</u>, 361 N.E.2d 999, 1001 (N.Y. 1977) (citing Corbin, Contracts § 1). Thus, in searching for the probable intent of the parties, "lest form swallow substance, [a Court's] goal must be to accord the words of the contract their fair and reasonable meaning." <u>Sutton v. East River Savings Bank</u>, 435 N.E.2d 1075, 1078 (N.Y 1982) (citing <u>Heller v. Pope</u>, 164 N.E. 881 (1928)).

When interpreting a contract, the Court must not only take into consideration the literal language, but whatever may be reasonably implied therefrom. <u>Sutton</u>, 435 N.E.2d at 1078. Even when another construction of language is within the realm of rationality, such a construction should not be accepted when that construction does not "coincide with what the parties must have intended." <u>Id</u>. at 1079. "Indeed, if ambiguity can be said to lurk in the placement of the word, in our opinion deference would be due to the confluence of the principal purposes of the parties to the agreement[.]" <u>Id</u>.

---

[5] The Agreement expressly provides that it "shall be governed in accordance with, the laws of the State of New York."

It is well-settled that "where a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord the reasonable expectations of the parties." Reape v. New York News, Inc., 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986); see also, Interdigital Communications Corporation v. Nokia Corporation, 407 F. Supp.2d 522, 530 (S.D.N.Y. 2005)("It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical."). Thus, the Court may reject a literal reading of a disputed provision which would defeat and contravene the purpose of the agreement. Reape, 504 N.Y.S.2d at 470.

A.  **ACS's interpretation is contrary to the primary purpose and intent of the ETC and leads to an absurd result**.

ACS attempts to convince this Court that a plain reading of the language of Section 8(b) and the application of strict mathematical principles results in a calculation of the ETC which yields a negative number. The absurdity of ACS's interpretation is paramount when applying ACS's strict mathematical formula to calculate the ETC as it pertains to a termination in the last six months of the Agreement as set forth in the last sentence of Section 8(b). Significantly, in the last six months of the contract, the amounts invoiced [and thus the payments TSCI would be entitled to receive under the first sentence of Section 8(b)], would always be greater than the "Remaining Balance" as interpreted by ACS. Consequently, using ACS's mathematical formula, the ETC would always be a negative number in the last six months of the contract term, which makes no business sense. In other words, ACS's interpretation of the Agreement would render the ETC completely meaningless in the last 6 months of the Agreement.

ACS's interpretation of what it claims to be the "plain meaning" of the language contained in Section 8(b) is simply contrary to the intent and purpose of the ETC. The ETC is a stipulated compensation provision clearly intended to provide TSCI a positive measure of relief

in the event that ACS unilaterally terminated the Agreement (without any default on the part of TSCI) and chose not to reassign TSCI's resources to other projects.  It is unreasonable to believe that TSCI would have bargained away its right to the benefit of ACS's full performance of the Agreement for nothing in return, which is essentially what ACS is attempting to have this Court believe based upon its interpretation of the literal language of Section 8(b).

Section 8(b) states as follows:

> (b)   TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period.  ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by  TSCI, if Termination within the last six month period of the Contract.

There is only one reasonable way to interpret Section 8(b) to effect its clear intent and purpose in providing TSCI with a positive measure of compensation from ACS in the event of an early unilateral termination of the Agreement.  The first sentence of Section 8(b) assumes that ACS would pay (and thus TSCI would be entitled to receive payment for) any outstanding invoices issued through the month when the Notice of Termination was received by TSCI.  The ETC constitutes a measure of compensation "<u>in addition</u>" to the amounts invoiced, which is in consideration for TSCI permitting ASC to terminate the Agreement early "for convenience."  In other words, if TSCI did not receive the benefit of the full contract term, then it was entitled to some reduced measure of compensation above and beyond that which it had already invoiced ACS for work performed under the Agreement.

The ETC for a termination in the first 18 months of the Agreement is simply calculated as 50% of the "remaining balance." The language which follows--"of the total Amended Scope Cost minus the actual payments received by TSCI"--is simply the definition of the term "remaining balance." Thus, the word "of" after the term "remaining balance" in this context means "that is; having the designation; specified as." See Webster's New World Dictionary (3rd Ed. 1994) at 940.[6] Stated otherwise, "ACS will pay Early Termination Charges in an amount equal to 50% of the remaining balance ["specified as" or "that is"] the total Amended Scope Cost minus the actual payments received by TSCI." This is consistent with the plain meaning of the term "balance" which in this context is defined as "whatever is left over; remainder." See Webster's New World Dictionary (3rd Ed. 1994) at 104.

Applying this rational interpretation to the language of Section 8(b), the ETC is easily calculated and would always yield a positive number no matter when ACS chose to terminate the Agreement for convenience. It is undisputed that the Amended Scope Cost is $5,440,000.00, and that the total amounts invoiced through August of 2007 is $1,914,766.00.[7] Thus, the "remaining balance" is $3,525,234.00 [$5,440,000 minus $1,914,766], which is multiplied by 50% to yield the ETC of $1,762,617.00.

ACS, on the other hand, arrives at a figure for the remaining balance [$3,525,234.00] by subtracting the total amounts invoiced from the total Amended Scope Cost [$5,440,000 - $1,914,766].[8] It then multiplies that figure by 50% to yield the figure of $1,762,617.00. From

---

[6] The word "of" can also mean: having as its base of operation, point of initiation or source of issuance or derivation. Thus, the "remaining balance" is derived from the total Amended Scope Cost minus the actual payments received by TSCI.

[7] The term "remaining balance" is not defined in any other section of the Agreement.

[8] ACS misstates the figures provided by TSCI by stating that the amount paid by ACS is $1,914,766.00. At no time has TSCI ever claimed that the total amount paid by ACS was $1,914,766.00. In TSCI's Motion for Summary Judgment, TSCI expressly stated that at the time of termination, TSCI had invoiced a total of $1,914,766.00 through August of 2007 and that TSCI had not paid $217,216.00 of the amounts invoiced. (See Statement of Points and Authorities in Support of Plaintiff, Transformational Strategies, Inc.'s Motion for Summary Judgment [Dkt.7] at 9).

this figure, ACS <u>again</u> subtracts the amounts invoiced [$1,914,766.00] which yields a negative number. In other words, ACS's formula for calculating the ETC would have this Court subtract the amounts invoiced by TSCI [$1,914,766] <u>twice</u>, which makes no rational sense.

Contrary to the intent of the Agreement, ACS randomly <u>assumes</u> that the parentheses for its mathematical formula should surround the term "remaining balance." If ACS wants to rely upon strict mathematical principles, then it must apply such principles properly. The formula must recognize that the term "of" after "remaining balance" is the starting point of the definition of "remaining balance" and must be ascribed the "equals" symbol so that the parentheses do not close until the end of the sentence. In other words, the proper formula based upon the clear intent of the Agreement is as follows:

$$ETC = .5 \times (\$3,525,234 = \$5,440,000 - \$1,914,766)$$

$$ETC = .5 \times \$3,525,234$$

$$ETC = \$1,762,617$$

It is significant that subsequent to the termination of the Agreement for convenience,[9] TSCI consistently calculated the ETC as $1,762,617 and provided ACS with its demands for payment. At no time prior to the institution of this lawsuit did ACS ever dispute TSCI's calculation of the ETC or suggest in any way that its calculations were in error. Furthermore, until the filing of its Motion for Partial Dismissal, ACS never claimed that the ETC was a negative number. Certainly, if TSCI's interpretation of the agreement reflecting the clear intent of the parties in providing a positive measure of compensation to TSCI in the event of a termination for convenience by ACS, were not the correct interpretation, then one would have

---

[9] For purposes of this Motion, ACS does not dispute that ACS chose not to opt for Section 8(a) above by modifying "the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the same Terms and Conditions, other than the new amended scope."

expected ACS to have disputed TSCI's calculations in some form prior to the institution of the present lawsuit. See Brown Bros. Elec. Constrs. v. Beam Constr. Corp., 361 N.E.2d 999, 1001 (N.Y. 1977) ("the aim is a practical interpretation of the expressions of the parties to the end that there be `a realization of (their) reasonable expectations.' That principle is especially applicable here, where, at least until the litigation ensued, the actions of neither party appears to have been guided by the norms and forms of legal counsel." (citations omitted) (emphasis supplied)).

This case is not unlike the case of Reape v. New York News, Inc., supra, in which the Supreme Court, Appellate Division of New York affirmed the entry of summary judgment in favor of a newspaper company which had been sued on a breach of contract theory by one of its newspaper carriers. The issue in the case involved a disputed interpretation of the paper's agreement to pay the carrier. The Court pointed out that a literal interpretation of the disputed provision supported the carrier's interpretation that he was entitled to receive a fee of 24 cents for each copy of the Monday through Saturday issues of the Daily News he delivered home subscribers in his designated area, rather than the newspaper's contention that he was to receive a total of 24 cents for the entire six days.

The Court rejected the literal interpretation of the language, because "such an interpretation would defeat and contravene the purpose of the agreement." Reape, 504 N.Y.S.2d at 470. The Court noted that "[s]ince the intent of the parties in entering an agreement is a paramount consideration when construing a contract, even the actual words provided therein may be transplanted, supplied or entirely rejected to clarify the meaning of the contract." Id. The Court held that:

> [i]n the instant case, it would be unreasonable to conclude that the defendant intended to assume a net loss for each copy delivered by the plaintiff, as the record indicates would have happened if the plaintiff's interpretation was adopted. Moreover, there is no reasonable explanation why the parties would intend that

the plaintiff earn substantially less for each delivery of the Sunday newspaper which concededly sold for three times the price of the daily issues.

Id. The Court went on to hold that:

> [n]or are we prepared to disregard the remaining provisions of paragraph 2 of the agreement which offered an optional method of compensation to those agents whose daily subscribers numbered at or fewer than 900, which was the situation of the plaintiff. If plaintiff's interpretation of the contract provision is correct, then this option, clearly intended to protect agents with a small number of subscribers by guaranteeing them a minimum weekly fee, would be rendered meaningless. It has been repeatedly stated that an interpretation of a contract should not be adopted if to do so would leave a provision thereof without force or effect.

Id.

Even if this Court were to conclude that ACS's interpretation of the Agreement is a rational one based upon its plain meaning, the result should be the same. As the Court of Appeals of New York recognized in Sutton v. East River Savings Bank, 435 N.E.2d 1075, 1079 (N.Y 1982), when a construction of a contract is within the realm of rationality, but does not coincide with what the parties "*must have intended,*" deference should be due to the "confluence of the principal purposes of the parties to the agreement." (Emphasis supplied). In sum, the clear intent of the Agreement was to provide a positive measure of compensation to TSCI in the form of the ETC in the event of an early unilateral termination of the Agreement by ACS. ACS's interpretation of how the ETC should be calculated is wrong and is contrary to this undisputed intent and should be rejected by this Court.

WHEREFORE, TSCI respectfully requests that this Court enter an Order denying Defendant, ACS Healthcare, LLC's Motion for Partial Dismissal and grant such further relief which this Court deems appropriate.

Respectfully submitted,


/s/ J. Stephen McAuliffe, III
/s/ James A. Sullivan, Jr.
_____
J. STEPHEN McAULIFFE, III – (Bar #432378)
JAMES A. SULLIVAN, JR. – (Bar #475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland  20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail: smcauliffe@milesstockbridge.com
E-mail: jsullivan@milesstockbridge.com

Attorneys for the Plaintiff, Transformational Strategies Consulting, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. * <br> * <br> Plaintiff * <br> * <br> vs. * <br> * <br> * <br> ACS STATE HEALTHCARE, LLC * <br> * <br> Defendant * | Case No. 07-cv-01606-ESH |

**ORDER DENYING MOTION FOR PARTIAL DISMISSAL OF COMPLAINT**

Upon consideration of Defendant, ACS Healthcare, LLC's Motion for Partial Dismissal of Complaint and the Memorandum of Points and Authorities in Opposition thereto filed by Plaintiff, Transformational Strategies Consulting, Inc., it is on this _____ day of _____, 2007, by the United States District Court for the District of Columbia,

ORDERED, that the Motion for Partial Dismissal of Complaint be and the same is hereby DENIED.

_____
JUDGE ELLEN S. HUVELLE
United States District Judge
U.S. District Court for the District of Columbia

cc: J. Stephen McAuliffe, III
James A. Sullivan, Jr.
MILES & STOCKBRIDGE P.C.
11 N. Washington Street
Suite 700
Rockville, Maryland 20850

Lynn M. Deavers, Esquire
David E. Mills, Esquire
DOW LOHNES, PLLC
1200 New Hampshire Avenue, N.W., Suite 800
Washington, D.C. 20036-6802