**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC. | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Case No. 07-cv-01606-ESH |
| | * | |
| | * | |
| ACS STATE HEALTHCARE, LLC | * | |
| | * | |
| Defendant | * | |

**PLAINTIFF, TRANSFORMATIONAL
STRATEGIES, INC.'S REPLY MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Transformational Strategies Consulting, Inc. (hereinafter, "TSCI"), Plaintiff, by its attorneys, J. Stephen McAuliffe, III, James A. Sullivan, Jr. and Miles & Stockbridge P.C., pursuant to Fed. R. Civ. P. Rule 56 and LCvR 7(d), files this Reply Memorandum in support of its Motion for Summary Judgment[1] and for grounds in support thereof states as follows:

## I.    INTRODUCTION

In its Memorandum of Points and Authorities in Opposition to TSCI's Motion for Summary Judgment, ACS State Healthcare, LLC ("ACS") mischaracterizes TSCI's arguments and attempts to generate factual issues based upon facts which are simply false and, therefore, not genuine. ACS specifically argues that:  (1) TSCI's interpretation of the early termination provision ignores key words and conflicts with the plain meaning of the contract language; (2) TSCI's calculation of the Amended Scope Cost is inaccurate because it ignores the contract language, erroneously assumes that full staffing was provided to ACS, and ignores personnel

---

[1] TSCI adopts and incorporates the arguments set forth in its Memorandum in Opposition to Defendant, ACS Healthcare, LLC's Motion for Partial Dismissal of Complaint.

reductions directed by ACS in June of 2007; (3) TSCI repeatedly overcharged ACS and is not entitled to the amounts claimed on its outstanding invoices.

Contrary to ACS's assertions, TSCI's interpretation of the Agreement constitutes the <u>only</u> fair and reasonable reading of its language and supports that which was clearly intended by the parties.  On the other hand, ACS's interpretation of what it claims to be the plain meaning would lead to an absurd result and would nullify and render the contract language meaningless. Furthermore, TSCI's calculation of the Amended Scope Cost is supported by the plain language of the Agreement and is based upon full staffing as agreed by the parties at the time of contract signing.  ACS's post-litigation claims that the Amended Scope Cost should be recomputed based upon the actual days worked by TSCI personnel, and claims that TSCI overcharged ACS for the invoices issued prior to contract termination are desperate attempts to reduce the number that it clearly owes TSCI.

As addressed in more detail below, ACS has failed to carry its burden of establishing a genuine issue of material fact; therefore, TSCI is entitled to summary judgment based upon the contract language and the undisputed material facts.

**A.    <u>TSCI's interpretation of Section 8(b) providing for Early Termination Charges (ETC) is the only reasonable interpretation.</u>**

A court should accord the language of a contract its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish.  <u>Terwilliger</u>, 206 F.3d at 245 (citing <u>Cable Science Corp. v. Rochdale Village, Inc.</u>, 920 F.2d 147, 151 (2nd Cir. 1990)).  "Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms. . . .[T]he contract must

be interpreted so as to give effect to, not nullify, its general or primary purpose." <u>Reda v. Eastman Kodak Co.</u>, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) (internal citations omitted). [2]

When interpreting a contract, the Court's aim is to determine "a practical interpretation of the expressions of the parties to the end that there be a `realization of [their] reasonable expectations.'" <u>Brown Bros. Elec. Constrs. v. Beam Constr. Corp.</u>, 361 N.E.2d 999, 1001 (N.Y. 1977) (citing Corbin, Contracts § 1). Thus, in searching for the probable intent of the parties, "lest form swallow substance, [a Court's] goal must be to accord the words of the contract their fair and reasonable meaning." <u>Sutton v. East River Savings Bank</u>, 435 N.E.2d 1075, 1078 (N.Y 1982) (citing <u>Heller v. Pope</u>, 164 N.E. 881 (1928)).

When interpreting a contract, the Court must not only take into consideration the literal language, but whatever may be reasonably implied therefrom. <u>Sutton</u>, 435 N.E.2d at 1078. Even when another construction of language is within the realm of rationality, such a construction should not be accepted when that construction does not "coincide with what the parties must have intended." <u>Id</u>. at 1079. "Indeed, if ambiguity can be said to lurk in the placement of the word, in our opinion deference would be due to the confluence of the principal purposes of the parties to the agreement[.]" <u>Id</u>.

It is well-settled that "where a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord the reasonable expectations of the parties." <u>Reape v. New York News, Inc.</u>, 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986); <u>see also</u>, <u>Interdigital Communications Corporation v. Nokia Corporation</u>, 407 F. Supp.2d 522, 530 (S.D.N.Y. 2005)("It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical."). Thus, the Court may reject a literal reading of a disputed

---

[2] The Agreement expressly provides that it "shall be governed in accordance with, the laws of the State of New York."

provision which would defeat and contravene the purpose of the agreement.    Reape, 504 N.Y.S.2d at 470.

At the outset, ACS argues that TSCI must take the position that the Agreement is ambiguous and, in that event, should be construed against TSCI as the drafter of the Agreement. This argument is a "red herring" because:  (1) the Agreement is not ambiguous; (2) TSCI's interpretation constitutes the only fair and reasonable reading of the contract language; and (3) ACS's interpretation of what it claims to be the plain meaning of the contract language would lead to an absurd result and would nullify and render the contract language meaningless.

Under these circumstances, the rule that a contract should be construed against the drafter simply does not apply.  See Reape, 504 N.Y.S.2d at 470.  Regardless, ACS's claim that the Agreement was drafted by TSCI is simply false.  The Agreement was a negotiated contract based upon language drafted by both parties as recognized by ACS's Chief Operating Officer, Tom Burlin.  (See Declaration of Tom Burlin at ¶8).[3]

ACS further contends that TSCI's interpretation of the Termination Provision ignores key words and conflicts with the plain meaning of the language.  Again, TSCI's interpretation is the only rational interpretation of the contract language.  The absurdity of ACS's interpretation is paramount when applying ACS's strict mathematical formula to calculate the ETC as it pertains to a termination in the last six months of the Agreement as set forth in the last sentence of Section 8(b).  Significantly, in the last six months of the contract, the amounts invoiced [and thus the payments TSCI would be entitled to receive under the first sentence of Section 8(b)], would always be greater than the "Remaining Balance" as interpreted by ACS.  Consequently, using ACS's mathematical formula, the ETC would always be a negative number in the last six months

---

[3] TSCI proffers that it has several drafts of the Agreement which were exchanged between the parties which clearly shows that the Agreement, including the specific language at issue herein was negotiated and drafted by both parties.

of the contract term, which makes no business sense.  In other words, ACS's interpretation of the Agreement would render the ETC completely meaningless in the last 6 months of the Agreement.

ACS's interpretation of what it claims to be the "plain meaning" of the language contained in Section 8(b) is contrary to the intent and purpose of the ETC.  ACS's attempt to convince this Court that the parties intended that the ETC would "be reduced to zero after a fairly short time, if (but only if) ACS made substantial payments along the term of the Amendment[,]" does not make rational sense. (See ACS Opposition at 2).  If the ETC would have been reduced to zero "after a fairly short time," then there would have been no need to provide for an ETC in the last 6 months of the Agreement.

Section 8(b) states as follows:

> (b)    TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI.  In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period.  **ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by  TSCI, if Termination within the last six month period of the Contract**.

(emphasis supplied).

The ETC for a termination in the first 18 months of the Agreement is calculated as <u>50% of the "remaining balance</u>."  The language which follows--"of the total Amended Scope Cost minus the actual payments received by TSCI"—is the definition of the term "remaining balance."  Thus, the word "of" after the term "remaining balance" in this context means "that is; having the designation; specified as."  <u>See</u> Webster's New World Dictionary (3rd Ed. 1994) at

940.[4]  Stated otherwise, "ACS will pay Early Termination Charges in an amount equal to 50% of the remaining balance ["specified as" or "that is"] the total Amended Scope Cost minus the actual payments received by TSCI."  This is consistent with the plain meaning of the term "balance" which in this context is defined as "whatever is left over; remainder."  See Webster's New World Dictionary (3rd Ed. 1994) at 104.

Applying this rational interpretation to the language of Section 8(b), the ETC would always yield a positive number no matter when ACS chose to terminate the Agreement for convenience.  It is undisputed that the Amended Scope Cost is $5,440,000.00, and that the total amounts invoiced through August of 2007 is $1,914,766.00.[5]  Thus, the "remaining balance" is $3,525,234.00 [$5,440,000 minus $1,914,766], which is multiplied by 50% to yield the ETC of $1,762,617.00.

ACS, on the other hand, arrives at a figure for the remaining balance [$3,525,234.00] by subtracting the total amounts invoiced from the total Amended Scope Cost [$5,440,000 - $1,914,766].[6]  It then multiplies that figure by 50% to yield the figure of $1,762,617.00.  From this figure, ACS again subtracts the amounts invoiced [$1,914,766.00] which yields a negative number.  In other words, ACS's formula for calculating the ETC would have this Court subtract the amounts invoiced by TSCI [$1,914,766] twice, which makes no rational sense.

Contrary to the intent of the Agreement, ACS randomly assumes that the parentheses for its mathematical formula should surround the term "remaining balance."  If ACS wants to rely

---

[4]  The word "of" can also mean: having as its base of operation, point of initiation or source of issuance or derivation.  Thus, the "remaining balance" is derived from the total Amended Scope Cost minus the actual payments received by TSCI.

[5]  The term "remaining balance" is not defined in any other section of the Agreement.

[6]  ACS misstates the figures provided by TSCI by stating that the amount paid by ACS is $1,914,766.00.  At no time has TSCI ever claimed that the total amount paid by ACS was $1,914,766.00.  In TSCI's Motion for Summary Judgment, TSCI expressly stated that at the time of termination, TSCI had invoiced a total of $1,914,766.00 through August of 2007 and that TSCI had not paid $217,216.00 of the amounts invoiced.  (See Statement of Points and Authorities in Support of Plaintiff, Transformational Strategies, Inc.'s Motion for Summary Judgment [Dkt.7] at 9).

upon strict mathematical principles, then it must apply such principles properly. The formula must recognize that the term "of" after "remaining balance" is the starting point of the definition of "remaining balance" and must be ascribed the "equals" symbol so that the parentheses do not close until the end of the sentence. In other words, the proper formula based upon the clear intent of the Agreement is as follows:

$$ETC = .5 \times (\$3,525,234 = \$5,440,000 - \$1,914,766)$$

$$ETC = .5 \times \$3,525,234$$

$$ETC = \$1,762,617$$

This case is not unlike the case of <u>Reape v. New York News, Inc.</u>, <u>supra</u>, in which the Supreme Court, Appellate Division of New York affirmed the entry of summary judgment in favor of a newspaper company which had been sued on a breach of contract theory by one of its newspaper carriers. The issue in the case involved a disputed interpretation of the paper's agreement to pay the carrier. The Court pointed out that a literal interpretation of the disputed provision supported the carrier's interpretation that he was entitled to receive a fee of 24 cents for each copy of the Monday through Saturday issues of the Daily News he delivered home subscribers in his designated area, rather than the newspaper's contention that he was to receive a total of 24 cents for the entire six days.

The Court rejected the literal interpretation of the language, because "such an interpretation would defeat and contravene the purpose of the agreement." <u>Reape</u>, 504 N.Y.S.2d at 470. The Court noted that "[s]ince the intent of the parties in entering an agreement is a paramount consideration when construing a contract, even the actual words provided therein may be transplanted, supplied or entirely rejected to clarify the meaning of the contract." <u>Id</u>. The Court held that:

> [i]n the instant case, it would be unreasonable to conclude that the defendant intended to assume a net loss for each copy delivered by the plaintiff, as the record indicates would have happened if the plaintiff's interpretation was adopted. Moreover, there is no reasonable explanation why the parties would intend that the plaintiff earn substantially less for each delivery of the Sunday newspaper which concededly sold for three times the price of the daily issues.

Id.  The Court went on to hold that:

> [n]or are we prepared to disregard the remaining provisions of paragraph 2 of the agreement which offered an optional method of compensation to those agents whose daily subscribers numbered at or fewer than 900, which was the situation of the plaintiff.  If plaintiff's interpretation of the contract provision is correct, then this option, clearly intended to protect agents with a small number of subscribers by guaranteeing them a minimum weekly fee, would be rendered meaningless.  It has been repeatedly stated that an interpretation of a contract should not be adopted if to do so would leave a provision thereof without force or effect.

Id.

Even if this Court were to conclude that ACS's interpretation of the Agreement is a rational one based upon its plain meaning, the result should be the same.  As the Court of Appeals of New York recognized in Sutton v. East River Savings Bank, 435 N.E.2d 1075, 1079 (N.Y 1982), when a construction of a contract is within the realm of rationality, but does not coincide with what the parties "must have intended," deference should be due to the "confluence of the principal purposes of the parties to the agreement."  (Emphasis supplied).  In sum, the clear intent of the Agreement was to provide a positive measure of compensation to TSCI in the form of the ETC in the event of an early unilateral termination of the Agreement by ACS.  ACS's interpretation of how the ETC should be calculated is wrong and is contrary to this undisputed intent and should be rejected by this Court.

**B.      The Amended Scope Cost was a set number calculated at the time of contract signing and was not subject to adjustment.**

ACS attempts to convince this Court that the Amended Scope Cost was miscalculated by TSCI so as to inflate the entire calculation of the ETC.  Contrary to ACS's arguments, the Amended Scope Cost was a fixed number based upon a mathematical formula expressly provided in the Agreement, was determined by virtue of ACS's initial designation of personnel at contract signing, and once calculated was never to change.

Pursuant to the Agreement, ACS was to "designate at contract signing the initial number of Senior Executives and Senior Specialists" which was used to determine the Amended Scope Cost.  The Amended Scope Cost was determined by the following formula:  "[(# of Senior Executives * $530,000 + # of Senior Specialist * $300,000) * 2 years]."  Based upon that figure, ACS was then required to pay TSCI within one day of contract signing an advance payment of 10% of the Amended Scope Cost.  Accordingly, the Amended Scope Cost had to be precisely calculated and set within one day of contract signature and there is no provision in the Agreement for its subsequent modification.

There is no dispute that ACS designated four (4) Senior Executives and two (2) Senior Specialists and that it paid TSCI an advanced payment of $544,000.00 which was 10% of the Amended Scope Cost of $5,440,000.00.[7]  The Amended Scope Cost is not an "estimated" number, nor was this number once calculated ever to change.  While it is true that, under certain circumstances, TSCI may have been required to return a portion of the advance payment, these circumstances never occurred, and by no means was the Amended Scope Cost to have been recalculated even if those circumstances had occurred.

---

[7] There is no dispute that the parties agreed that ACS could substitute the two Senior Specialists for one (1) "Super CTO at $600,000.00 per year which did not change the calculation of the Amended Scope Cost.

ACS claims that the Amended Scope Cost should be reduced because TSCI did not "provide a full compliment of five executives until May 2007." Accordingly, ACS argues that it is entitled to a refund of a portion of the $544,000 advance payment and, therefore, the Amended Scope Cost must be recalculated.

As explained previously, the Amended Scope Cost once set was never to be recalculated. The personnel did not miraculously appear the day after contract signing ready to work for ACS and such a fact did not mandate a recalculation of the Amended Scope Cost under the Agreement. To the contrary, it was recognized by both parties that there would have to be an initial period of time necessary for TSCI's recruitment of personnel. The advance payment was in recognition of the efforts that needed to be made in that regard. Tom Burlin acknowledges this fact in his declaration: "[w]hen the parties negotiated the Amendment, TSCI made clear that it needed a substantial amount of up-front cash to recruit high-level personnel to work for ACS....TSCI wanted to recoup the investment it would make in recruiting executives."

The contract does provide for a refund of a portion of the advance payment but it does not specify a time period by which the engagement of personnel had to take place. TSCI was required to refund a portion of the advance payment if and only if TSCI was <u>never</u> able to engage the number designated at contract signing, i.e. that TSCI's recruitment efforts for which the advance payment was made were fruitless. In other words, if at contract termination, it was determined that TSCI had never recruited and engaged the full compliment of personnel designated by ACS, then ACS would be entitled to a refund of the advance payment based upon the pro rata share of the 10% down payment attributable to the non-engaged personnel.

ACS acknowledges that TSCI did recruit and provide a full compliment of staff as of May 2007. Therefore, a recomputation of the advance payment was never warranted.

Nevertheless, ACS contends that the Amended Scope Cost had to be recalculated and reduced because in June of 2007 ACS specifically directed TSCI to remove two Senior Executives, Chris McClenaghan and Mark Baenziger, "that were consistently unable to perform the work needed by ACS." (See ACS Opposition at 23). This statement is: (1) false because both Chris McClenaghan and Mark Baenziger continued to work for ACS until the time of contract termination and their work was specifically authorized by ACS, (see e-mails attached hereto as Exhibit 1); and (2) not relevant because the Amended Scope Cost had a specific formula based upon the initial number of personnel designated by ACS at contract signing and was not subject to adjustments by virtue of any unilateral decision by ACS to reduce TSCI staff.

In fact, the Agreement provides that: "[i]f at any time during the term of this Agreement, any TSCI personnel is found to be negligent in the performance of their work, then TSCI shall, upon receipt of written notice from ACS, replace such personnel with substitute qualified personnel within 30 days." There is no evidence of any written notice provided by ACS that Chris McClenaghan and Mark Baenziger were negligent and should have been removed. Instead, the e-mails between the parties confirm that ACS continued to utilize their services through contract termination. Furthermore, ACS acknowledges that it paid Invoice SC08 for the month of July which covered the work of the full compliment of five (5) TSCI personnel.

In conclusion, the Agreement permits ACS to receive a refund of the advance payment under certain circumstances but it does not allow ACS to reduce the Amended Scope Cost at any time.

**C. TSCI did not overcharge ACS and it is clearly entitled to all amounts set forth in the invoices provided to ACS.**

**1.    ACS was not improperly charged for Fernando Salgado's time.**

ACS maintains that TSCI improperly charged ACS for work allegedly performed by its President, Fernando Salgado between April 11 and April 16, 2007. This argument completely lacks merit and is easily discounted. Mr. Salgado's compensation was initially covered by the original Agreement which expired on April 10, 2007. Thereafter, Mr. Salgado was designated and approved by ACS as one of the five (5) individuals covered under the Amendment. In an e-mail dated March 23, 2007, Fernando Salgado wrote to Paul Lehman of ACS confirming that: "This will complete the team of 5 to be covered under your current authorized budget of the SC Amendment D, Acton; **F. Salgado (from 4/10/07)** and M. Fleming (from 4/10/07); Chris McClenaghan and Kumar Bhaskaran." (emphasis supplied). On April 2. 2007, Paul Lehman sent an e-mail to Fernando Salgado in which he stated that this arrangement was "**Approved**." (Emphasis supplied). (See e-mails attached hereto as Exhibit 2). Although ACS now claims that it mistakenly paid the invoice covering Mr. Salgado's time from April 11, 2007 to April 16, 2007, it cannot escape the reality that its argument is blatantly false and inconsistent with its own admissions.

**2.    TSCI did not improperly charge ACS for "Overtime."**

ACS attempts to misconstrue charges for work performed by TSCI personnel on weekends and holidays as "overtime" charges not covered under the terms of the Agreement. Specifically, ACS challenges the amounts reflected on Invoice No.'s SC06, SC07 and SC08.

The Agreement expressly provides that the "Contractual year has 240 work days. The monthly billing will be based on actually worked full time equivalent work days during the month." (Emphasis supplied). There is no requirement in the Agreement to suggest the specific

days the 240 work days had to take place nor is there any restriction from TSCI personnel working on weekends or holidays.  The fact that TSCI personnel worked on weekends and holidays to fulfill the "full time equivalent work days during the month" does not take away from the requirement that ACS was required to pay for this time.  Certainly, TSCI personnel never exceeded the allotted yearly days (240) and there is no evidence to suggest that prior to the instant litigation ACS contended that the time invoiced had not been performed or was not necessary.  Furthermore, the undisputed evidence shows that ACS had previously paid TSCI the full amount reflected in invoices SC02 and SC03 and SC05, each of which included services performed on weekends and holidays.  (See invoices attached hereto as Exhibit 3).

**3.     TSCI's August Invoice should not be reduced.**

For the reasons set forth in Section B above, there is no question that both Chris McClenaghan and Mark Baenziger continued to work for ACS until the time of contract termination and their work was authorized by ACS.  (See Exhibit 1).  Consequently, because there is simply no basis in fact for ACS's argument that the August invoice should be reduced, ACS has failed to create a genuine issue of fact for this Court to base a denial of summary judgment.

WHEREFORE, TSCI respectfully requests that this Court enter an Order granting its Motion for Summary Judgment and such further relief which this Court deems appropriate.

Respectfully submitted,


/s/ J. Stephen McAuliffe, III
/s/ James A. Sullivan, Jr.

_____
J. STEPHEN McAULIFFE, III – (Bar #432378)
JAMES A. SULLIVAN, JR. – (Bar #475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland  20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail: smcauliffe@milesstockbridge.com
E-mail: jsullivan@milesstockbridge.com

Attorneys for the Plaintiff, Transformational
Strategies Consulting, Inc.

**From:** Acton, Dan [Dan.Acton@acs-inc.com]
**Sent:** Tuesday, July 24, 2007 2:21 PM
**To:** Deelsnyder, Christopher
**Subject:** Follow-up discussion re support to Enterprise

Chris,

I met with Tom late yesterday as an action item from the recent TSCI email exchange with him. A number of our concerns were addressed as follows:

- He feels there is significant likelihood Tasos will be able to work with the NH Client to change delivery dates and scope
- He understands that Wipro's schedule performance continues to be highly problematic, but knows Tasos will continue to engage the services of IBM and MSS to address ES2
- He has confidence in TSCI's abilities to support Tasos in the execution of the program and understands the challenges we face in helping some of his management team
- He commends our ability to jump into an ES/ITSS problem and believes we can provide on-going support in a similar manner

In summary, he would like me to work with Tasos (and Ray if it helps ITSS for ES) to continue engaging the five members of our TSCI team. The Recovery Action Plan ("development accelerator teams") was prepared in the spirit of meeting the NH Client's deadline. Now that the key assumptions, in particular the criticality of the deadline, have changed this plan is no longer applicable. As such, we are pleased to support Tasos on his current "course and speed" plan.

While we have some on-going work underway with Tasos and the team at this time, I plan to follow up with him, Rod (technical team) and Doug (PMO) to organize our engagement further. Tom's overall direction - "help Tasos on enterprise."

If you have a few minutes towards the end of your day today, I can drop by for any further steerage.

Most sincerely,
Dan

**EXHIBIT**

**1**

**Fernando Salgado**

| | |
|---|---|
| **From:** | d.acton@tsci.biz |
| **Sent:** | Monday, July 16, 2007 5:22 PM |
| **To:** | Salgado, Fernando |
| **Subject:** | Confidential - meeting and next steps |

Fernando,

I wanted to capture a couple thoughts in writing before I call.

I was well prepared for the meeting with Chris. He said he wanted to read some of the many materials later on.

He wanted to spend face time with me talking about perceptions and how TSCI can help make a difference, not just an expensive reporter of audits.

Before last week's email to Tom, and the negative effects it had on Tasos, not a single negative comment had been made to Chris about TSCI. In fact, he thought things had improved and were going quite well. He had us (TSCI) covered in the budget and heard very good things about Mark and Chris, and the team in general. Tasos thinks Kumar may be too academic; I disputed and explained to Chris the many things Kumar has helped folks plan and develop. He said IBM folks really like him, CEO likes him, the client likes him, and that he is firmly holding Wipro to their tasks.

He believes the issue is not with our (TSCI) skills but still fallout from the past over relationships. He believes Tasos should become more directive of our activities and that we should have a forum to express issues rather than send them to Tom. Minimally, he wished I would have called him personally rather than get Tom involved, as Tasos is "the answer" for making enterprise work for ACS. They have all made their stancd (CEO, Tom, Chris) so he must succeed.

He will call Tasos and let him know that after meeting with me and "straightening me out" (some of his words) that he wants the two of us to meet and figure out an improved plan for us (TSCI) to work together. And then I can meet with Tom, later this week.

There are more details...so I will call shortly.
R/Dan

```
X-Account-Key: account4
X-UIDL: 1185484901.32056.mail11,S=4241
X-Mozilla-Status: 0011
X-Mozilla-Status2: 00000000
Return-Path: <Craig.Jameson@acs-inc.com>
Delivered-To: mcclen@394751.401771
Received: (qmail 12418 invoked by uid 78); 26 Jul 2007 21:18:04
-0000
Received: from unknown (HELO ns-mr5.netsolmail.com)
(10.49.16.164)
  by 0 with SMTP; 26 Jul 2007 21:18:04 -0000
Received: from dalexmm02.acs-inc.com (dalexmm02.acs-inc.com
[63.101.151.4])
    by ns-mr5.netsolmail.com (8.13.6/8.13.6) with ESMTP id
16QLI3bj025061;
    Thu, 26 Jul 2007 17:18:03 -0400
Received: from unknown (HELO tytexbr01.sls-tt.acs-inc.com)
([63.87.170.72])
  by dalexmm02.acs-inc.com with ESMTP; 26 Jul 2007 16:22:50 -
0500
X-IronPort-Anti-Spam-Filtered: true
X-IronPort-Anti-Spam-Result:
AgAAAOOrqEY/V6pIomdsb2JhbAAtjzsBAQEBAgUKBwgY
Received: by tytexbr01.sls-tt.acs-inc.com with Internet Mail
Service (5.5.2657.72)
    id <NW7FK2FV>; Thu, 26 Jul 2007 17:17:55 -0400
Message-ID:
<230D542E1D720148906D0AC3871C30130174F034@tytexu04.sls-tt.acs-
inc.com>
From: "Jameson, Craig" <Craig.Jameson@acs-inc.com>
To: "'bha@tsci.biz'" <bha@tsci.biz>
Cc: "'mcclen@tsci.biz'" <mcclen@tsci.biz>,
      "Fortney, Rod"
    <Rod.Fortney@acs-inc.com>,
      "'d.acton@tsci.biz'" <d.acton@tsci.biz>,
      "Hoth, Thomas" <Thomas.Hoth@acs-inc.com>,
      "Shikari, Faiyaz"
    <Faiyaz.Shikari@aes-inc.com>
```

Subject: Re: Discussion on Code Review -- could we have a call tomorrow (F
        riday)
Date: Thu, 26 Jul 2007 17:22:16 -0400
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2657.72)
Content-Type: text/plain;
        charset="utf-8"

Sure, we will take all the help we can get.  Tom Hoth and I have already
defined a process and the team began executing this week.

We currently have a working draft of the doc that describes the process.
Tom could you please send a copy to kumar and chris so that they can read it
befor our call tomorrow?

Fyi. This afternoon we held a review summary session for the current review
package. This week we had 5 people review approx 7000 loc finding *pprox 175
issues.

Any timetomrrow other than 930 to 1130 or 200 to 300 is good for me

Regards

Craig Jameson

ACS
1800 M St. NW
Washington DC 20036
202.378.2817 (v)
202.203.8878 (m)

-----Original Message-----
From: Kumar Bhaskaran <bha@tsci.biz>
To: Craig.Jameson@acs-inc.com <Craig.Jameson@acs-inc.com>
CC: Chris McClenaghan <mcclen@tsci.biz>; Fortney, Rod
<Rod.Fortney@acs-inc.com>; Dan Acton <d.acton@tsci.biz>
Sent: Thu Jul 26 16:46:38 2007
Subject: Discussion on Code Review -- could we have a call tomorrow (Friday)

Hi Craig

Chris and I were asked to help out with design and code review (Please
see email below) and we wanted to get your thoughts on the code review
to develop a work plan.

Could we have a short call tomorrow (Friday) to talk about the Code
Review activity? Please let me know and I can request Donna to setup a
conference call.

Also, Chris and I plan to be in Atlanta on Monday (07/30) to meet with
Faiyaz to further elaborate on the work plan to include design review
and then get Rod's concurrence.

regards
kumar

Original Message --------
Subject:     Fwd: Work with Faiyaz
Date:        Thu, 26 Jul 2007 19:01:44 +0000
From:        d.acton@tsci.biz
To:          bha@tsci.biz, "Fleming, Marilyn" <mv.fleming@tsci.biz>,
"Mark
Baenziger" <mmbaenz@yahoo.com>, mcclen@tsci.biz


Kumar and Chris,

Please help Faiyaz on code and design review activity.

See Tasos email below.

-----Original Message-----
From: Tsolakis, Tasos
Sent: Thursday, July 26, 2007 2:10 PM
To: Acton, Dan
Subject: Re: Work with Faiyaz

Please do continue. Rod will be in tomorrow.

Tasos

---------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is
for the sole use of the intended recipient(s) and may contain confidential
and privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message.

-----Original Message-----
From: Acton, Dan
To: Tsolakis, Tasos
Sent: Thu Jul 26 13:28:20 2007
Subject: Work with Faiyaz

Tasos,

Quick question...should we continue helping Faiyaz, such as design review
support, or wait until Rod returns?

Also, I have a meeting set up with you and would like to discuss systems
integration support.

Thanks...Dan

From:  Acton, Dan <Dan.Acton@acs-inc.com>

To:  'tasos.file@tsci.biz' <tasos.file@tsci.biz>,  'itss.file@tsci.biz' <itss.file@tsci.biz>

Cc:

Date:  Monday, August 20, 2007 07:42 pm

Subject:  FW: Confiential FW: Some follow-up on my concerns about EPT testing in Pittsburgh

-----Original Message-----
From: Tsolakis, Tasos
Sent: Tuesday, July 03, 2007 3:06 PM
To: Acton, Dan
Subject: RE: Confiential FW: Some follow-up on my concerns about EPT testing
in Pittsburgh

Dan,

Thanks. These seem environmental issues that Ray needs to address.

Tasos

-----Original Message-----
From: Acton, Dan
Sent: Tuesday, July 03, 2007 2:55 PM
To: Tsolakis, Tasos
Subject: Confiential FW: Some follow-up on my concerns about EPT testing in
Pittsburgh

Tasos,
Mark is working with Faiyaz on this. Just wanted to keep you in the loop.
In our discussions with Ray last week, he definitely felt the need for using
Mark's skills, helping both ITSS and the SC work collaboratively. We are
following up...thanks/Dan

-----Original Message-----
From: Baenziger, Mark
Sent: Tuesday, July 03, 2007 4:16 AM
To: Shikari, Faiyaz
Cc: Bhaskaran, Kumar; Acton, Dan
Subject: Some follow-up on my concerns about EPT testing in Pittsburgh

Faiyaz,

I've made a bit more headway on my research into why I think that the
EPT environment in Pittsburgh has fairly significant configuration
weaknesses that will limit the utility of the EPT testing as currently
configured.

Specifically, I'm fairly (95%+) confident that around half of the EPT
systems haven't been moved into the final network that they're intended
to function in when the system goes into production. What this means is
the following:

(1) Webseal servers (which have been moved into their final environment)
will not be able to connect to the current location of the portal
servers (though there's a chance, due to a misconfigured rule, that
roughly half the queries will make it through), and may have limited
connectivity with tam/ldap (yet to be determined). This could
definitely have configured to the issues you were having with Webseal in
recent EPT test.s
(2) We are not adequated confirming the impact of the firewall and
content switches on the environment. Until all of the connectivity
between different layers is being passed between the actual hardware
infrastructure that will live in production, I'm reluctant to consider
this an adequate EPT. I have had numerous experiences with significant
latency and performance problems being introduced by both firewalls and
load-balancers, so I feel it is valuable to attempt to address this up
front.
(3) Because various web, app, and data layer systems are located both

inside and outside the proper environment, the ability to test new
functionality will be fairly challenging until all of the connectivity
and firewall rules are created.

I'll give you an additional update tomorrow morning after I talk to the
relevant ITSS folks. Please give me call if you have any questions.

Thanks,
Mark

ACS - Affiliated Computer Solutions, Inc.
Mark Baenziger
Director, Information Assurance
TSCI Infotech Management, LLC
E-mail: mark.baenziger@acs-inc.com <mailto:mark.baenziger@acs-inc.com>
Office: 503-273-4363
Mobile: 503-708-4572

Attachments:

-----Original Message-----
From: Acton, Dan
Sent: Friday, May 11, 2007 10:27 AM
To: Tsolakis, Tasos; Stratton, Stacy
Cc: Fleming, Marilyn - NASHCCON
Subject: RE: Wipro and Contact Management

In addition, since the number of use cases had grown, this was one area that we investigated for lifting out without affecting other components per se. But, Wipro thought this was a ploy to get the number of use cases down and tried another attempt to increase funding based on the "use case" quantity argument, therefore the objection to decrease, and then the request for a formal CR. By leaving it in, they will likely want to revisit the number of use cases. That part of the SOW argument will resurface.
(Marilyn...believe we need to prepare for that discussion on Wed.)

-----Original Message-----
From: Tsolakis, Tasos
Sent: Friday, May 11, 2007 9:36 AM
To: Stratton, Stacy
Cc: Acton, Dan; Fleming, Marilyn - NASHCCON
Subject: RE: Wipro and Contact Management

My understanding was that Wipro was balking at taking it out. They said it was too complex to implement with existing solution. They wanted a formal CR and most likely they would charge us to take it out and then integrate with the second solution.

We never sent a formal CR and we should not have to pay any extra.

Marilyn can provide email history.

Tasos

-----Original Message-----
From: Stratton, Stacy
Sent: Friday, May 11, 2007 6:59 AM
To: Tsolakis, Tasos
Cc: Acton, Dan; Fleming, Marilyn - NASHCCON
Subject: FW: Wipro and Contact Management

Below, a heads up.

1. Wipro is balking at re-inserting Contact Management. I will discuss w/ PV today. I will check the history w/ Marilyn/Dan about why this was taken out originally.
2. How did the decision to put it back to Wipro come about?

Stacy
-----------------------------

Pv
I informed you and vinay verbally of this by telephone cc on monday and wed may 9, and also informed you at that time that the formal memorandum was in process. I will follow up with you directly tomrrow and also by email to resolve.
Stacy
-----------------------------

Sent using BlackBerry

-----Original Message-----
From: SubbaRao, Pushadapu - NASHCCON
To: Fleming, Marilyn - NASHCCON; 'Marilyn Fleming, TSCI' <mv.fleming@tsci.biz>
CC: 'shankar.nidumolu@wipro.com' <shankar.nidumolu@wipro.com>; Kelly, Robert - NASHCCON; Chillara, Rajesh - NASHCCON; 'syamala.lanka@wipro.com' <syamala.lanka@wipro.com>; Krishnan, Murali - NASHCCON; Jones, Capas; Kellogg, Scott; Srikant, Faiyaz; Lloyd, Mary; Siemmer, Lucy; Steffen, Craig; Darr, Arthur; Driscoll, Kevin; Turner, Darrell; Hutt, Sean; Mitchell, Doug;

http://mail.tsci.biz/cgi-bin/viewmail.exe?id=01423ee055abe83lbac87d1c0b36b87583l&r    11/25/2007

LaGore, Doug; Barnett, Ed; King, Mike; Rodriquez, Angel; Joyner, Jon; Allen,
Jessica; Stratton, Stacy
Sent: Thu May 10 19:42:37 2007
Subject: RE: Weekly Status Report – Updated - 05/10

Marilyn,

I will get the 1 & 3rd points taken care of.

Coming to the 2nd point, this is the first time that we are hearing on the
change in ACS intention towards contact management. Also, Wipro was asked to
void the tasks pertaining to contact management in the workplans, hence
Wipro has removed these tasks from the execution plan and revised the
resource plan accordingly on case/contact management since the formal
communication made by ACS. Therefore, Wipro requests ACS to formalize the
intention and schedule a discussion.

Thanks
PV

———

From: Fleming, Marilyn - NASHCCON
Sent: Thursday, May 10, 2007 7:15 PM
To: Krishnan, Murali - NASHCCON; Jones, Capas; Kellogg, Scott; Shikari,
Faiyaz; Lloyd, Mary; Slemmer, Lucy; 'Marilyn Fleming, TSCI'; Steffen, Craig;
Darr, Arthur; Driscoll, Kevin; Turner, Darrell; Hiatt, Sean; Mitchell, Doug;
LaGore, Doug; Barnett, Ed; King, Mike; Rodriquez, Angel; Joyner, Jon; Allen,
Jessica; Stratton, Stacy
Cc: 'shankar.nidumolu@wipro.com'; SubbaRao, Pushadapu - NASHCCON; Kelly,
Robert - NASHCCON; Chillara, Rajesh - NASHCCON; 'syamala.lanka@wipro.com'
Subject: RE: Weekly Status Report - Updated - 05/10
Importance: High

Here are my comments again. None of them have been incorporated.

As Stacy said in her email, Risk #51 status needs to be updated. It is now
at the Tasos/Vijay level, no longer at the Marilyn/PV level. Update the
item.
Chart 6, CR for formalizing Contact Management descoping. ACS no longer
plans to remove Contact Management from Wipro scope. ACS expects Wipro to
continue to work on this, as Wipro stated they planned to in their response
memo. Remove the item.
Chart 7, I have a copy of the Master Test Plan submitted on 5/7/07 but it is
not on Chart 7 and is not on any of the charts dealing with deliverables at
all. Please clarify and update the chart accordingly.

Marilyn Fleming
540-891-5381(Office 1)
770-829-1588 (Office 2)
540-847-6066 (Mobile)

———

From: Krishnan, Murali - NASHCCON
Sent: Thursday, May 10, 2007 7:06 PM
To: Jones, Capas; Kellogg, Scott; Shikari, Faiyaz; Lloyd, Mary; Slemmer,
Lucy; 'Marilyn Fleming, TSCI'; Fleming, Marilyn - NASHCCON; Steffen, Craig;
Darr, Arthur; Driscoll, Kevin; Turner, Darrell; Hiatt, Sean; Mitchell, Doug;
LaGore, Doug; Barnett, Ed; King, Mike; Rodriquez, Angel; Joyner, Jon; Allen,
Jessica; Stratton, Stacy
Cc: 'shankar.nidumolu@wipro.com'; SubbaRao, Pushadapu - NASHCCON; Kelly,
Robert - NASHCCON; Chillara, Rajesh - NASHCCON; 'syamala.lanka@wipro.com'
Subject: RE: Weekly Status Report - Updated - 05/10

Please find enclosed the updated weekly status report as on 05/10.

Thanks and Regards

Murali Krishnan
CISSP, CISM
Wipro Technologies @ ACS , Atlanta

From:   Acton, Dan <Dan.Acton@acs-inc.com>

To:   'tasos.file@tsci.biz' <tasos.file@tsci.biz>
Cc:

Date:   Thursday, August 16, 2007 11:03 am
Subject:   Chris M to work with Judith

---

-----Original Message-----
From: Tsolakis, Tasos
Sent: Tuesday, July 17, 2007 2:07 PM
To: Acton, Dan
Subject: Re: Quick follow-up

Yes He can work with Judith for the next 45 days.

Tasos
--------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is
for the sole use of the intended recipient(s) and may contain confidential
and privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply e-mail and destroy all copies of the original
message.

-----Original Message-----
From: Acton, Dan
To: Tsolakis, Tasos
Sent: Tue Jul 17 13:09:56 2007
Subject: Quick follow-up

Tasos,

Would you like Chris to work with Judith in preparation of the workshop on
GAP?

Can he attend the ReqPro training/work session?

We can hammer out things further tomorrow, but these items are being worked
att.

R/Dan

Attachments:

Work + 770 829 1166

---

From: Krishnan, Murali - NASHCCON
Sent: Thursday, May 10, 2007 3:29 PM
To: Jones, Capas; Kellogg, Scott; Shilkari, Faiyaz; Lloyd, Mary; Slemmer,
Lucy; 'Marilyn Fleming, TSCT'; Fleming, Marilyn - NASHCCON; Steffen, Craig;
Darr, Arthur; Driscoll, Kevin; Turner, Darrell; Hiatt, Sean; Mitchell, Doug;
LaGore, Doug; Barnett, Ed; King, Mike; Rodriguez, Angel; Joyner, Joe; Allen,
Jessica; Stratton, Stacy
Cc: 'shankar.nidemolu@wipro.com'; SubbaRao, Pushadapu - NASHCCON; Kelly,
Robert - NASHCCON; Chillara, Rajesh - NASHCCON; 'syamala.lanka@wipro.com'
Subject: Weekly Status Report - Ready for Review - 05/10

Please find enclosed the weekly status report as on 04/26, ready for review.


Do let me know, if you have any questions.

Thanks and Regards

Murali Krishnan
CISSP, CISM
Wipro Technologies @ ACS , Atlanta
Work + 770 829 1166

---

Attachments:

From:  Jones, Capas <Capas.Jones@acs-inc.com>

To:  McClenaghan, Chris <Chris.McClenaghan@acs-inc.com>,  Kellogg, Scott <Scott.Kellogg@acs-inc.com>
Cc:  Hanson, Judith <Judith.Hanson@acs-inc.com>,  Norman, Karen D <karen.d.norman@acs-inc.com>,
Lloyd, Mary <M.Lloyd@acs-inc.com>
Date:  Tuesday, June 05, 2007 12:26 pm
Subject:  RE: gap arrangement and responsibilities

Yep!

**From:** McClenaghan, Chris
**Sent:** Tuesday, June 05, 2007 11:47 AM
**To:** Jones, Capas; Kellogg, Scott
**Cc:** Hanson, Judith; Norman, Karen D; Lloyd, Mary
**Subject:** gap arrangement and responsibilities

Capas and Scott,

My thoughts are that Judith is the GAP manager (per your assignment) and Karen and I are providing support in terms of process and procedures for which Judith will be responsible. Various teams - SMEs, release/CCB, etc – will actually execute the process and procedures, Judith will ensure that all goes according to plan, schedule, and process.

Have I got it right at a high level?

Chris

Chris McClenaghan
(04) 171-404-1523
m (04) 171-404-1524

Attachments:

**Fernando Salgado**

Sent:        Wednesday, June 20, 2007 5:13 PM
To:          Repic, Ray
Cc:          Childers, Brett; Brewer, Jeff; Russo, Vincent A
Subject:     RE: Follow-up request for resources on Enterprise System

Ray,

I've been giving some thought to this idea as well.  I agree in principal with the idea of a
"less-than-Production" status for the Pittsburgh Enterprise System environment, but I believe
that we should be cautious about significantly relaxing controls on an environment that is
both partially shared with live production systems (SAN, backup, core-switching resources),
and will eventually graduate to full production status.

I think it would be helpful to spell out what it means to open up access to this "less-than-
production" environment.  Some of the key points (restrictions) that potentially come to
mind:

- No contractors to have long-term (> 5 days) accounts or/access to these systems
- A restricted group of ACS software engineers (QA or deployment engineers) with long term
accounts or/access to these systems
- A commitment to refresh the systems with clean images & do fresh deployments of all
components before converting the environment to production
- Clearly described descriptions of what ACS software engineers can/can't do on the system
- Some ability for security personnel (someone from Jeff's team?) to monitor/observe activity
- Network access to these systems only from specific, restricted internal ACS environments

I'm sure there are other requirements that would make everyone feel safer about this.  It
probably wouldn't hurt to have an informal MOU agreed between Ray & Tassos so that we get a
clear set of guidelines in place up front.  I can help draft that if folks feel like that is
a good approach.

Please let me know what you think.

Thanks,
Mark

-----Original Message-----
From: Repic, Ray
Sent: Wednesday, June 20, 2007 12:00 PM
To: Baenziger, Mark
Cc: Childers, Brett; Brewer, Jeff; Russo, Vincent A
Subject: RE: Follow-up request for resources on Enterprise System

Hey Guys,
I had a discussion with Tasos about the current build of servers in Pitts for Enterprise.
We were thinking that we should change how we reference this build to something other than
production. One issue we are having is that we have standard process to control and operate
under for any "production" rated ssytems.  Although what was already built in Pitss was
called "production", it is not really production. The Production cut for Enterprise is
currently scheduled for mid 2008. Costs to build a QA environment that mirrors production are
too high. Therefore, we are using the build in Pitts to do QA and test work.

So, can we change the environment in Pitts to QA? Anything but "Production"??

i

Thoughts??
Ray

Raymond A. Repic
ACS Government Solutions Group
Vice President & CIO
ray.repic@acs-inc.com
Atlanta Office: 770.829.1094
Mobile: 404.431.2485

**Fernando Salgado**

| | |
|---|---|
| **From:** | Lehman, Paul [Paul.Lehman@acs-inc.com] |
| **Sent:** | Monday, April 02, 2007 5:59 PM |
| **To:** | Fernando Salgado |
| **Subject:** | RE: TSCI Contract resources |

Approved.

**From:** Fernando Salgado [mailto:F.Salgado@tsci.biz]
**Sent:** Friday, March 23, 2007 3:54 PM
**To:** Lehman, Paul
**Cc:** Deelsnyder, Christopher; Acton, Dan
**Subject:** TSCI Contract resources

Paul: this is to confirm Chris Deelsnyder authorization to bring two more resources into the TSCI Contract as per our proposal to Tom Burlin and Chris this past Monday with copy to you.

The new resources would be Chris McClenaghan to focus on a new approach (practical procedures + tools) to requirements extraction, documentation and formulation. This shall result in accurate but friendlier way to describe the solutions to the business LOB user and clients; help to prepare proposals faster; and a more accurate and efficient way to describe requirements to the technical community.

The other resource will be our super CTO. It is Kumar Bhaskaran. Please see attached his very impressive resume. Please see the addendums or additional tabs to the summary resume. I have known Kumar for the last 8 years and he worked in the team with Vish Narayan when we developed the Websphere family of integration products. He has also lately designed the next generation of business process modeling. Kumar is a brilliant mind, good manager but also hands on.

He will take the place and budget of the two specialists -- it is the only way we will be able to afford him.

This will complete the team of 5 to be covered under your current authorized budget of the SC Amendment D. Acton; F Salgado (from 4/10/07) and M. Fleming (from 4/10/07); Chris McClenaghan and Kumar Bhaskaran.

We are planning to meet with Kumar this Monday 26 to "close the deal" - if at all possible.

We will let you know the start dates for Chris and Kumar as soon as we sign contracts with them (soon).

We will also keep in the team working for ACS our web designer / communications specialists (Nick Glasnovich) at no cost to ACS. He is developing the SC web site and soon the solutions / applications portfolio management site.

Thanks, Fernando

1

**EXHIBIT**

2

*Transformational Strategies Consulting, Inc.*

# INVOICE

**Check payable to:** Transformational Strategies Consulting, Inc.
**Mail to:**   Treasurer
9645 Eagle Ridge Dr.
Bethesda, MD  20817-3920
Telephone: (301) 365-1246
Email: treasurer@tsci.biz

**ACS Vendor # 00246257**

**IRS #:** 02-0724100;   **DUNS:** 148685196   **Invoice Number: TSCI-SC02-Corrected**
Date:  28 – December - 2006

| **Contract Ref.:   ACS Solution Center Planning, Start up and Management** |
|---|
| Attention: |
| Mr. Paul Lehman |
| ACS State Healthcare , LLC |
| Cost Center _____ |
| P.O. Box 981256 |
| El Paso, TX 79998-1256 |

| DESCRIPTION OF SERVICES AND/OR REIMBURSABLE EXPENSES | AMOUNT |
|---|---|
| ACS Solution Center Planning. Start up and Management as per Exhibit 2, Amendment to Agreement with TSCI.  Time Sheets Attached **Performance period:  November 6/06 to December 31/06** Sr. Executive Rate at $ 1988.00 per work day. Dan Acton Days: 34 Davis Seckinger Days: 40 Landon Miller Days: 24 **Total Number of Days: 98** | $ 194,824.00 |
| **Amount Due** | **$194,824.00** |

Maria Salgado, Treasurer
TSCI Authorized Signature, January 18, 2007

**ACS Approval Signature for Payment**

Name_____
Date _____

**EXHIBIT**

**3**

*Transformational Strategies Consulting, Inc.*

# INVOICE

**Check payable to**: Transformational Strategies Consulting, Inc.
**Mail to:** Treasurer
      9645 Eagle Ridge Dr.
      Bethesda, MD  20817-3920
      Telephone: (301) 365-1246
      Email: treasurer@tsci.biz

**ACS Vendor # 00246257**

IRS #: 02-0724100;    **DUNS**: 148685196   **Invoice Number: TSCI-SC03**
                               Date:  05 – February - 2007

| **Contract Ref.:    ACS Solution Center Planning, Start up and Management** |
| --- |
| **Attention:** |
|      Mr. Paul Lehman |
|      ACS State Healthcare , LLC |
|      Cost Center |
|      P.O. Box 981256 |
|      El Paso, TX 79998-1256 |

| **DESCRIPTION OF SERVICES AND/OR REIMBURSABLE EXPENSES** | **AMOUNT** |
| --- | --- |
| ACS Solution Center Planning, Start up and Management as per Exhibit 2, Amendment to Agreement with TSCI.  Time Sheets Attached **Performance period:  January 1/07 to  February 4/07 Sr. Executive Rate at $ 1988.00 per work day.** Dan Acton Days: 16 Davis Seckinger Days: 24 <br><br> **Total Number of Days: 39** | $ 79,520.00 |
| **Amount Due** | **$79,520.00** |

*Maria Salgado*
Maria Salgado, Treasurer
TSCI Authorized Signature, February 4, 2007

                            **ACS Approval Signature for Payment**

                            Name_____
                            Date _____

*Transformational Strategies Consulting, Inc.*

# INVOICE

**Check payable to:** Transformational Strategies Consulting, Inc.
**Mail to:** Treasurer
        9645 Eagle Ridge Dr.
        Bethesda, MD  20817-3920
        Telephone: (301) 365-1246
        Email: treasurer@tsci.biz

**ACS Vendor #** 00246257

**IRS #:** 02-0724100;    **DUNS:** 148685196   **Invoice Number: TSCI-SC05**
                                Date:  April 10 - 2007

| Contract Ref.:   ACS Solution Center Planning, Start up and Management |
|---|
| **Attention:** |
|        Mr. Paul Lehman |
|        ACS State Healthcare , LLC |
|        Cost Center _____ |
|        P.O. Box 981256 |
|        El Paso, TX 79998-1256 |

| DESCRIPTION OF SERVICES AND/OR REIMBURSABLE EXPENSES | AMOUNT |
|---|---|
| ACS Solution Center Planning, Start up and Management as per Exhibit 2, Amendment to Agreement with TSCI.  Time Sheets Attached<br>**Performance period:  March 5/07 to  April  10/07**<br>**Sr. Executive Rate at $ 1988.00 per work day.**<br>Dan Acton Days: 28<br><br>**Total Number of Days: 28** | $ 55,664.00 |
| **Amount Due** | **$55,664.00** |

*Maria Salgado*
Maria Salgado, Treasurer
TSCI Authorized Signature, April 10, 2007

**ACS Approval Signature for Payment**

Name_____
Date  _____  _____