UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| TRANSFORMATIONAL STRATEGIES CONSULTING, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 07-1606 (ESH) ) |
| ACS STATE HEALTHCARE, LLC, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

Plaintiff Transformational Strategies Consulting, Inc. ("TSCI") has sued ACS State Healthcare, LLC ("ACS") for breach of contract, seeking to recover approximately $2 million allegedly owed as a result of ACS's early termination of the parties' agreement. TSCI has filed a motion for summary judgment, and ACS has moved to dismiss the complaint to the extent that TSCI seeks payment of "Early Termination Charges" under the agreement. As set forth herein, ACS's motion will be granted in part and denied in part, and TSCI's motion will be denied.

## BACKGROUND

In October 2005, ASC and TSCI entered into an agreement (the "Original Agreement") for TSCI to provide "Executive Consulting and Advice Regarding the Architecture and Development of the ACS Enterprise Claims Processing Application," a software application. (Pl.'s Statement of Undisputed Material Facts ["Pl.'s Statement"] ¶ 1; Affidavit of Fernando Salgado ["Salgado Aff."], Ex. 1 at 1.) In September 2006, the parties executed an Amendment to the Original Agreement (the "Amendment") for TSCI to provide "Executive Management Resources and Consulting and Advice Regarding Planning, Start up and Formational Executive

Management" of the "ACS Solution Center." (Pl.'s Statement ¶ 2; Salgado Aff., Ex. 2 at 1.) The Amendment included an additional scope of work to be performed, as well as amended provisions regarding staffing, compensation, and termination. (*See id.*, Ex. 2.)

The Amendment contemplated that ACS would designate "at contract signing the initial number of Senior Executives and Senior Specialists" to staff the additional scope of work, and specified annual rates of compensation for each category of professional - - $530,000 per year for each Senior Executive and $300,000 per year for each Senior Specialist. (*Id.* at 3.) With respect to payment, the Amendment provided for an advance payment of ten percent of the "Amended Scope Cost" - - defined in the Amendment as equal to "[(# of Senior Executives * $530,000 + # of Senior Specialist * $300,000) * 2 years[1]]" - - and for monthly billing by TSCI "based on actually worked full time equivalent work days during the month." (*Id.* at 3-4.)

Although the Amendment included an expiration date of October 15, 2008, it permitted early termination by ACS in certain circumstances:

> ACS can terminate this Agreement in case of TSCI default due to grave cause or negligence imputable to TSCI, if TSCI fails to remedy to the satisfaction of ACS said default within 30 days of ACS written notification to this effect. Should ACS terminate, TSCI shall be paid the Invoices issued up to and including the current month, pro-rated if for a partial month, of final determination to Terminate.
>
> If, at the ACS'S sole discretion, the Agreement for this Amended Scope is terminated for the convenience of ACS; then ACS can, at its sole discretion, select one of the following two options:
>
> a) ACS would be able to modify the scope of assignment of the TSCI resources, for the remainder of the original period of two years, to other projects that require similar skills and experience under the

---

[1]The term for the Amendment was approximately two years, beginning on September 15, 2006 and ending on October 15, 2008. (Salgado Aff., Ex. 2 at 1.)

        same Terms and Conditions, other than the new amended scope or

    b)    TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI. In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period. ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by TSCI, if Termination within the last six month period of the Contract.

(*Id.* at 2.)

    The parties signed the Amendment on September 18, 2006 (*id.* at 4), and ACS made its initial staffing designations by email that same day, designating four Senior Executives and two Senior Specialists as the "[i]nitial people."[2] (Pl.'s Statement ¶ 5; Salgado Aff., Ex. 3.) TSCI thereafter issued an invoice to ACS in the amount of $544,000, ten percent of an Amended Scope Cost of $5,440,000, calculated based on ACS's initial designations, and ACS paid the invoice the following month. (Pl.'s Statement ¶¶ 6-7; Salgado Aff., Exs. 4-5.)

    In May 2007, ACS determined that TSCI had billed it for work performed by TSCI personnel on weekends and holidays. (Decl. of Kevin Cleary ["Cleary Decl."] ¶ 11.) Kevin Cleary, a Director of Finance for the Government Solutions Group of ACS, Inc., notified Dan Acton, a TSCI Senior Executive working for the Solution Center, that ACS did not authorize or approve these charges, and ACS then deducted the charges from the invoice in question. (*Id.* ¶¶

---

[2]At some point, the parties agreed to exchange the two Senior Specialists for one "CTO" whose annual compensation rate of $600,000 was equal to the combined rate of the two Senior Specialists, each of whom was compensated at a rate of $300,000 per year. (Pl.'s Statement ¶ 5 n.5; Def.'s Opp'n at 5.)

2, 11.) When TSCI continued to bill ACS for weekend and holiday work in later months, ACS again notified TSCI that the charges were not authorized and deducted those amounts from TSCI's invoices. (*Id.* ¶¶ 13, 16, 18.)

In June 2007, Anastasios Tsolakis, the ACS Senior Vice President in charge of the Solution Center, directed Acton to reduce TSCI's staff from five to three by removing two TSCI Senior Executives (Chris McClenaghan and Mark Baenziger) from the project due to their inability to perform the work needed by ACS. (Decl. of Anastasios Tsolakis ["Tsolakis Decl."] ¶ 7.) TSCI did not remove McClenaghan and Baenziger, who continued to perform work for ACS even after June 2007. (*Id.*; Pl.'s Reply at 11, 13 & Ex. 1.) The parties dispute whether this work after June 2007 was authorized by ACS.

On July 13, 2007, Tsolakis sent an email to Acton stating "[e]ffective Monday July 16th, you and your team need to find another sponsor at ACS. I will not need your services."[3] (Pl.'s Statement ¶ 18; Salgado Aff., Ex. 8.) Although it is undisputed that TSCI continued to do work for the ACS Solution Center after July 16, notwithstanding Mr. Tsolakis's email, the parties disagree as to whether this additional work was authorized. (*Compare* Pl.'s Statement ¶ 19 (TSCI continued to do work "because on information and belief Tom Burlin and other ACS executives told Mr. Tsolakis to continue to work with TSCI"), *with* Def.'s Statement of Genuine Issues of Material Fact ["Def.'s Statement"] ¶ 19 ("Mr. Burlin did not tell Mr. Tsolakis to continue to work with TSCI.").)

---

[3]Earlier in the month, Fernando Salgado, TSCI's President, had sent an email to Tom Burlin, the Chief Operating Officer of ACS's parent company and the executive to whom Salgado reported, expressing concerns about the project on which TSCI staff were working. (Pl.'s Statement ¶¶ 12, 14; Salgado Aff., Ex. 7.)

On August 14, 2007, Tsolakis notified Acton by telephone that ACS was terminating its agreement with TSCI effective August 17, 2007. (Pl.'s Statement ¶ 20.) Acton and Tsolakis thereafter exchanged emails confirming the termination and its August 17 effective date. (*Id.* ¶¶ 21, 23; Salgado Aff., Exs. 9, 11.) On August 17, 2007, TSCI's counsel sent a letter to ACS requesting payment of a total of $2,033,833, including $1,762,617 in Early Termination Charges under the Amendment and $271,216 allegedly owed on four invoices. (*Id.*, Exs. 12, 13.) ACS did not pay the requested amount, and plaintiff thereafter filed this action in September 2007.

## ANALYSIS

**I.     TSCI's Claim for "Early Termination Charges"**

Both parties attempt to argue that the Amendment, read as a whole, is unambiguous as to how "Early Termination Charges" should be calculated in the event of a termination for convenience by ACS, but they vigorously disagree as to how this calculation should be made. The Amendment provides, in relevant part, that

> TSCI shall be paid for the Invoices issue up to and including the month when the Notice of Termination for Convenience was received by TSCI. In addition, ACS will pay Early Termination Charges in an amount equal to fifty percent (50%) of the remaining balance of the total Amended Scope Cost minus the actual payments received by TSCI, if Termination within the first 18 months period. ACS will pay Early Termination Charges in an amount equal to twenty five percent (25%) of the remaining balance of the total Contract amount of Amended Scope Cost minus the actual payments received by TSCI, if Termination within the last six month period of the Contract.

(Salgado Aff., Ex. 2 at 2.)

ACS asserts that termination having occurred during the first eighteen months of the Amendment, any Early Termination Charges must be calculated by taking fifty percent of the

remaining balance of the total Amended Scope Cost and then subtracting from that figure the "actual payments received by TSCI." (Def.'s Mot. at 5-6.) Because, using TSCI's own dollar amounts, this calculation results in a negative number,[4] ACS contends that no Early Termination Charges are owed as a matter of law. (*Id.*)

In contrast, TSCI argues that, construing the contract language in light of its apparent purpose to provide TSCI with some positive amount of compensation in the event of an early termination for convenience by ACS, Early Termination Charges should be calculated by taking fifty percent of the "remaining balance," defined in the agreement as "the total Amended Scope Cost minus the actual payments received by TSCI." (Pl.'s Opp'n at 7.) Calculating the Early Termination Charges in this manner, TSCI contends that $1,762,617 is owed. (*Id.*)

Under New York law, which the parties agree governs this dispute (*see* Def.'s Mot. at 4; Pl.'s Opp'n at 4 n.5; Salgado Aff., Ex. 1 at 7 ¶ 21 (specifying that the Original Agreement "shall be governed by, and construed in accordance with, the laws of the State of New York")), construction of an unambiguous contract is a question of law for the Court, as is the prior question whether the agreement is clear or ambiguous. *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986); *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1077 (N.Y. 1982). In making

---

[4] Using TSCI's numbers, which ACS accepts only for purposes of its motion to dismiss, the "remaining balance of the total Amended Scope Cost" - - *i.e.*, the Amended Scope Cost ($5,440,000) minus the amounts invoiced by TSCI through August 2007 ($1,914,766) - - is $3,525,234, and fifty percent of this amount is $1,762,617. (Pl.'s Statement ¶¶ 26, 27.) From this amount, ACS then subtracts $1,914,766, resulting in Early Termination Charges of *negative* $152,149. (Def.'s Mot. at 6.)

TSCI objects that the $1,914,766 figure represents the total amount *invoiced* by TSCI through August 2007, rather than the total amount *paid* by ACS (Pl.'s Opp'n at 7 n.8); however, TSCI itself uses the $1,914,766 figure in place of the "actual payments received by TSCI" in calculating the Early Termination Charges. (*See id.* at 7.)

this determination, the Court must "look[] within the four corners of the document, not to outside sources," *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998); *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990), and must "read [the contract] as a whole to determine its purpose and intent." *Id.* "The proper inquiry . . . is 'whether the agreement on its face is reasonably susceptible of more than one interpretation.'" *Clark v. Clark*, 827 N.Y.S.2d 159, 160 (N.Y. App. Div. 2006) (quoting *Chimart Assocs.*, 489 N.E.2d at 233); *see also Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) ("A contract is ambiguous where its terms 'suggest more than one meaning' when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement.") (quoting *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)).

Applying these standards, the Court finds that the Amendment is ambiguous as to the proper method for calculating Early Termination Charges. ACS's interpretation is certainly reasonable in that it flows most naturally from the literal language of the Amendment, but that consideration alone is not dispositive. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115-16 (2d Cir. 1994) (finding loan agreement provision ambiguous notwithstanding that one party's interpretation "stray[ed] somewhat from the plain meaning of the words used in the second clause of the section" while the other party's interpretation "g[a]ve[] 'literal effect' to all the words of the clause"). It is also reasonable to interpret the early termination provision as ensuring TSCI some positive measure of compensation in the event of a unilateral termination by ACS. The Amendment provides that ACS "will pay" such charges "[i]n addition" to outstanding invoices (Salgado Aff., Ex. 2 at 2), and such compensation ensures that TSCI is better off financial in the event of a termination for ACS's convenience than if the termination were for

7

cause.  Only TSCI's interpretation effectuates this intent, and that interpretation is therefore reasonable as well.  Because both parties' interpretations of the early termination provision are "'sufficiently reasonable to render the [provision] ambiguous,'" *Mellon Bank, N.A.*, 31 F.3d at 115 (quoting *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 121 (2d Cir. 1985)), the Court cannot conclude that ACS's interpretation is correct as a matter of law, and the motion to dismiss must be denied.[5]  Moreover, because the parties have submitted "relevant extrinsic evidence of [their] actual intent," summary judgment is also inappropriate.  *Id.* at 116; *see also Sutton*, 435 N.E.2d at 1077-78 (absent a proffer of relevant extrinsic evidence, construction of even an ambiguous contract is for the court).  In light of this ruling, the Court need not address ACS's argument that summary judgment must be denied because facts material to TSCI's calculation of the Early Termination Charges allegedly owed are in dispute.  (*See* Def.'s Opp'n at

---

[5]ACS urges that any ambiguity in the Amendment must be construed against TSCI, which drafted both it and the Original Agreement.  (Def.'s Opp'n at 19-20; Def.'s Reply at 9 n.5.)  TSCI asserts, however, that the Amendment was negotiated and drafted by *both* parties.  (Pl.'s Reply at 4 & n.3; *see also* Decl. of Tom Burlin ["Burlin Decl."] ¶¶ 6, 8-9 (discussing negotiation of the Amendment).)  Ambiguities are not construed against the initial drafter in such circumstances.  *Compare Citibank, N.A. v. 666 Fifth Avenue Ltd. P'ship*, 769 N.Y.S.2d 268, 269 (N.Y. App. Div. 2003) (ambiguities in lease agreements were not to be construed against the defendant who drafted the initial versions, since the agreements "ultimately entered into resulted from extensive negotiations in which both parties, each a commercially sophisticated entity, were represented by counsel, and plaintiff failed to show that it 'had no voice in the selection of [the leases'] language'") (quoting *67 Wall St. Co. v. Franklin Nat'l Bank*, 333 N.E.2d 184, 187 (N.Y. 1975)), *and Coliseum Towers Assocs. v. County of Nassau*, 769 N.Y.S.2d 293, 296-97 (N.Y. App. Div. 2003) (holding the contra proferentem doctrine inapplicable where both parties participated in negotiating the terms of the lease in question), *with Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67-68 (2d Cir. 2000) (applying rule that "equivocal contract provisions are generally to be construed against the drafter" to a fee agreement between an attorney and an individual client).
    Nor is the Court persuaded that the failure to include parentheses in the definition of Early Termination Charges is dispositive.  (*See* Def.'s Reply at 6.)  Although the parties used parentheses elsewhere in the Amendment in defining the Amended Scope Cost, unlike the provision defining Early Termination Charges, that definition used mathematical symbols and more closely approximated a mathematical equation.

20-23.)

## II.  TSCI's Claim for Unpaid Invoices

In addition to Early Termination Charges, TSCI seeks an award of $271,216 for amounts billed on four invoices submitted to ACS between May and August 2007, which ACS has not paid to date.  ACS argues that TSCI is not entitled to summary judgment on these invoice claims because there are factual disputes as to whether ACS was properly charged for the amounts TSCI now seeks to collect.  In particular, ACS contends that it properly withheld payment of amounts invoiced for work performed by TSCI personnel on weekends and holidays and that it was improperly billed for work performed by Fernando Salgado in April 2007 and by Chris McClenaghan and Mark Baenziger in August 2007.

As to the latter issue, the Court agrees that summary judgment is not warranted at this stage.  With respect to Salgado's time, ACS argues that the charges are precluded by the Amendment, which provides that "[a]ctivities related to this statement of work (Exhibit 2) [*i.e.*, the Amendment] performed by Fernando Salgado will be included in the existing compensation of Exhibit 1 [*i.e.*, the scope of work under the Original Agreement]."  (Salgado Aff., Ex. 2 at 4.)  In response, TSCI has submitted an email exchange in which Paul Lehman, ACS's Chief Information Officer, approved Salgado's request "to bring two more resources [Chris McClenaghan and Kumar Bhaskaran] into the TSCI Contract," thereby "complet[ing] the team of 5 to be covered under your current authorized budget of the SC Amendment," a team which included Salgado himself "from 4/10/07."  (Pl.'s Reply Ex. 2.)  The parties have not addressed, however, whether this exchange is sufficient to amend the terms of the Amendment, and summary judgment is therefore premature at this point.

Summary judgment is also inappropriate as to TSCI's claim regarding the August 2007 invoice to the extent that that invoice includes charges for work performed by McClenaghan and Baenziger, since there is a disputed issue as to whether work by these individuals was authorized after June 2007.  (*Compare* Tsolakis Decl. ¶ 7 (stating that in June 2007, Tsolakis directed TSCI's Acton "to remove Chris McClenaghan and Mark Baenziger . . . because they were consistently unable to perform the work needed by ACS"), *with* Pl.'s Reply, Ex. 1 (emails reflecting that McClenaghan and Baenziger continued to do work for ACS even after June 2007 with ACS's knowledge and, in some instances, at ACS's direction).)  Charges for McClenaghan and Baenziger, however, account for only a portion of the August 2007 invoice.[6]  Thus, because TSCI does not dispute the remainder of the bill (*see* Def.'s Opp'n at 26 (stating that "the August 2007 Invoice should be reduced to $143,198.00"), plaintiff's motion for summary judgment as to this invoice will be granted in the amount of $143,198.[7]

---

[6]TSCI billed ACS $234,646 for the month of August 2007, reflecting "23 work days for 4 Sr. Executives + 1 CTO."  (Salgado, Aff., Ex. 12.)  Thus, as McClenaghan and Baenziger were both Senior Executives with a daily compensation rate of $1,988, their time accounted for only $91,448 of the invoiced amount.

[7]Elsewhere in its opposition, ACS asserts that it does not waive the right to raise at a later time the defense that TSCI's conduct justified a termination for cause (Def.'s Opp'n at 9 n.4), a defense that, if successful, could affect the amount owed by ACS on the August 2007 invoice. (*Compare* Salgado Aff., Ex. 2 at 2 (providing for pro-ration of invoices issued for the month of final determination to terminate in the event of a termination for cause), *with id.* (providing for payment of invoices issued up to and including the month when the notice of termination was received in the event of a termination for convenience).)  The Amendment permits termination by ACS "in case of TSCI default due to grave cause or negligence imputable to TSCI" but only "if TSCI fails to remedy to the satisfaction of ACS said default *within 30 days of ACS written notification to this effect*."  (*Id.* (emphasis added).)  Although ACS disputes TSCI's assertion that "[a]t no time did ACS ever provide TSCI written notice that it was in default of any term of the Agreement" (*compare* Pl.'s Statement ¶ 24, *with* Def.'s Statement ¶ 24), ACS has not produced evidence of any *written* notification provided to TSCI, nor has it filed a motion to continue summary judgment pending discovery on this issue pursuant to Rule 56(f).  Accordingly, ACS

Moreover, to the extent that TSCI seeks payment of charges for work performed by TSCI personnel on weekends and holidays, the Court finds that the material facts are not in dispute and that TSCI is entitled to judgment as a matter of law.[8] ACS contends that as "high-level and highly paid executives" who were compensated under the Amendment on a salary, rather than an hourly, basis, the TSCI personnel were not entitled to "overtime pay" for weekend work. (Def.'s Opp'n at 25.)

In addition to specifying an annual salary for each category of professional, the Amendment set daily compensation rates and provided for monthly billing by TSCI as follows:

> The Contractual year has 240 work days. The monthly billing will be based on actually worked full time equivalent work days during the month. The billing work day rate will be $2208 for each Sr. Executive and $1250 for each Sr. Specialist.[9] ACS shall not request any reduction in the number of work days from a minimum of 20 days per month. TSCI will provide, in each monthly billing, the accumulated number of work days in the year, such as not to exceed the total work days allocated for each category per Contract year.

(Salgado Aff., Ex. 2 at 3.) Although the Amendment provided that TSCI was "not to exceed the total work days allocated for each category per Contract year," it did not otherwise limit the work

---

has failed to raise a genuine issue as to whether the termination was for cause, rather than for convenience, and TSCI is entitled to summary judgment with respect to the $143,198 balance of the August 2007 invoice.

[8]ACS withheld a total of $36,570 from three invoices submitted by TSCI in May and June, 2007: $16,166 from Invoice SC06, dated May 13, 2007; $10,202 from Invoice SC07, dated May 31, 2007; and $10,202 from Invoice SC08, dated June 30, 2007. (Salgado Aff., Ex. 12; see also Cleary Decl., Exs. G-I.) ACS acknowledges that these shortfalls reflect "charges for work allegedly performed by TSCI personnel on weekends and holidays." (Def.'s Opp'n at 24; Def.'s Statement ¶ 28.)

[9]The compensation provision elsewhere provided that these daily compensation rates would be "reduced by 10% which is a net of $1988 per day for each Sr. Executive and $1125 per day for each Sr. Specialist." (Salgado Aff., Ex. 2 at 4.)

days for which TSCI could be compensated. Indeed, the fact that the parties specified that ACS could not request a reduction in the number of work days per month below a minimum of twenty suggests that they contemplated that there could be more than twenty work days in a given month. Thus, by its terms, the Amendment did not preclude TSCI from billing for "actually worked full time equivalent work days" falling on weekends and holidays.

ACS also suggests that "there is reason to believe" that TSCI personnel did not actually work on the holidays and weekend days reflected on the invoices "but rather wrote the hours down just to get paid for 'long hours' on other days that they worked during the week." (ACS's Opp'n at 25.) In support of this assertion ACS cites to the Declaration of Kevin Cleary and the invoices themselves, but those documents suggest only that TSCI billed for work days occurring on weekends and holidays, not that the billings for these days were fraudulent, and ACS has therefore failed to create a genuine factual issue as to whether TSCI personnel billed for days not actually worked.[10] Accordingly, TSCI's motion for summary judgment will be granted as to the unpaid amounts on Invoices SC07 and SC08, and as to $6,226 of the unpaid amount on Invoice SC06.[11]

## CONCLUSION

For the reasons set forth herein, plaintiff's motion for summary judgment is granted in

---

[10] Although ACS also asserts that "[w]hatever improper conduct occurred will surface in discovery" (Def.'s Opp'n at 25), it has not sought to continue summary judgment pursuant to Rule 56(f) so that such discovery can be taken.

[11] Although ACS withheld payment of a total of $16,166 on Invoice SC06 (*see* Salgado Aff., Ex. 12), this invoice also includes $9,940 in charges for work performed by Fernando Salgado. (Cleary Decl. ¶ 14 & Ex. G.) Because it remains unresolved whether ACS is entitled to a credit for the charges for Salgado's time, the Court will limit the grant of summary judgment to $6,226 of the shortfall on Invoice SC06 at this time.

part and denied in part, and defendant's motion for partial dismissal is denied.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: December 21, 2007